**BOWSER AND CAMPBELL, a partnership, and Lloyd H. Bowser and Stella Campbell, doing business as Bowser and Campbell, a partnership, Plaintiffs,**

v.

**KNOX GLASS, INC., a corporation, Defendant.**

**Civ. A. No. 66–106.**

United States District Court
W. D. Pennsylvania.

Feb. 20, 1967.

Michael J. Pugliese, Pittsburgh, Pa., for plaintiffs.

Judd N. Poffinberger, Jr., of Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARSH, District Judge.

In this action the plaintiffs, Bowser and Campbell, individually and as a partnership, doing business as a contract motor carrier, seek to recover $26,978.32 [1] additional charges for transporting glassware and cartons from the defendant, Knox Glass, Inc. After non-jury trial, the court makes the following:

### FINDINGS OF FACT

1. Plaintiffs in this action are Bowser and Campbell, a partnership, and Lloyd H. Bowser and Stella Campbell, individuals, doing business as Bowser and Campbell, a partnership, hereinafter called Carrier.

2. Defendant, Knox Glass, Inc. (Knox), is a corporation organized under the laws of the State of Pennsylvania, and has its principal office in Knox, Pennsylvania.

3. At all relevant times, Carrier was a contract motor carrier regulated by the applicable provisions of the Interstate Commerce Act, and as such contracted with Knox to haul its products from Knox, Marienville, Parker, Oil City, Kane and Sheffield, all points of origin in Pennsylvania, to destination points in Ohio and New York. Knox was a manufacturer of glassware with manufacturing facilities located at Knox, Marienville and Parker, Pennsylvania, and

warehouse facilities at Kane and Sheffield, Pennsylvania.

4. The several shipments of glassware and empty packing cartons shown on plaintiffs' Exhibit 2 were made by Knox as shipper and hauled by Carrier as a contract carrier.

5. During the period of time here involved, Carrier performed services as a contract motor carrier for Knox pursuant to a written transportation agreement dated May 14, 1958, executed by both parties, Carrier and Knox (defendant's Ex. F).

6. The transportation agreement (Ex. F) provided that the Carrier would be compensated for transportation service in accordance with " 'MC 1218, MF–I.C.C. No. 3 Schedule of Charges for Transportation as a Contract Carrier', supplements thereto and reissues thereof."

7. "MC 1218, MF I.C.C. NO. 3 SCHEDULE OF CHARGES FOR THE TRANSPORTATION, AS A CONTRACT CARRIER" was issued April 28, 1958, effective May 1, 1958 (plaintiffs' Ex. 1; defendant's Ex. C). This schedule was in effect during the period of time here involved. The schedule did not contain a written rule or regulation affording Knox the privilege of stopping a shipment to complete loading. (See: Ex. C, p. 4, Item 40(A).)

8. Despite the absence in the Schedule of Charges of a regulation allowing the privilege of stopping in transit, the Carrier, as a contract motor carrier, during the period of time here involved and prior thereto, had afforded Knox and its predecessor, Knox Glass Associates, Inc., stopping for loading and unloading privileges in connection with the movement of the Knox products.

9. For all of the shipments shown on Carrier's Exhibit 2, Knox paid Carrier an agreed charge of $6, later $10, for additional stops at the Pennsylvania Knox plants to complete loading of goods. The freight charges were always com-

---

1. The agreed amount of the claim (T., pp. 9–10; plaintiffs' Ex. 3). Freight charges alleged to be due prior to January 24, 1960 are barred by the Statute of Limitations.

puted on the aggregate weight of the shipment in Carrier's truck as it proceeded to destination. (Pretrial Stipulation, p. 3; T., pp. 56–57; plaintiff's Exs. 2, 4, 5, 6, 7.)

10. In the agreement executed between Carrier, by Harold R. Bowser, its authorized representative, and Knox, dated August 21, 1964 (defendant's Ex. G), Carrier admitted that the freight charges which it collected from Knox during the period involved in this suit were the charges agreed upon by the parties.[2] In addition, Mr. Bowser, appearing as a witness for Carrier, admitted in his testimony that the charges collected were the charges which Carrier had intended to charge and which the parties had agreed upon.

11. The Schedule of Charges MC 1218, MF I.C.C. NO. 3 (defendant's Ex. C) was supplemented effective January 25, 1964, to provide a published rule permitting defendant to stop a shipment to complete loading (defendant's Ex. D) in conformity with the long-existing understanding, billing practice, and the actual contract between the parties.

12. During the period involved in these proceedings, there were other motor carriers, including W. I. Womeldorf & Sons, a common carrier used by Knox for the same type of transportation and in the same areas for which Carrier's services were employed by Knox (T., pp. 71–73).

13. W. I. Womeldorf & Sons, according to its tariff effective July 28, 1960, provided common carrier truck service for hauling glass containers and cartons from points in Pennsylvania to points in Delaware, Maryland, New Jersey and New York (defendant's Ex. I).

14. The common carrier tariff of Womeldorf provided the same basic level of rates and resulting charges as were paid by Knox to Carrier. In addition, Womeldorf's tariff provides the privi-

lege of stopping in transit to complete loading with a charge of $10 for each stop-off (defendant's Ex. I, Rule No. 8, Stopping-in-Transit).

15. The tariff of another common carrier, Motorway Corporation (defendant's Ex. J), likewise provides a competitive rate to points in Ohio. The Motorway Corporation's tariff (Ex. J, Item 50) provides a stop-off privilege to complete loading at a charge of $10 per stop.

16. Carrier collected $6, and later $10, for additional stops at the Knox plants to complete loading, although this was not specifically provided in its filed Schedule (Ex. C).

17. During an investigation by representatives of the Interstate Commerce Commission in the latter part of 1963, Carrier was "ordered" to collect undercharges from Knox, because the investigation disclosed that Carrier's billings were based on aggregate weight, regardless of the number of points of origin where additional stops to pick up freight were made, in disregard of the provisions in the Schedule of Charges (defendant's Ex. C, Item 40(A)). Subsequently, Carrier amended its Schedule of Charges, effective January 25, 1964 (Ex. D) to reflect the actual contract between and the existing conduct and practice of the parties. Despite this amendment, separate criminal proceedings were filed by the Interstate Commerce Commission against Carrier in March, 1964, and against Knox in June, 1964, alleging violations of the Interstate Commerce Act prohibiting collection and payment of less than published charges (T., pp. 94–110).

18. Because of the criminal actions, Knox consulted S. Sidney Eisen, Esquire, a transportation consultant, who after meeting with representatives of Carrier and the Interstate Commerce Commission prepared an agreement

---

2. It is stated in Exhibit G, p. 2: "[T]hat both B&C [Carrier] and Knox agree that the charges so paid and collected [for more than 30 years] were based on rates, rules and provisions mutually desired, intended and agreed upon, and, accordingly, the charges so paid are considered by both to have been those actually contracted for."

wherein Carrier acknowledged that the charges which had been collected were the charges the parties had agreed upon and further released Knox from any future claim for such charges (defendant's Ex. G; T., pp. 115–116).

19. Pursuant to the conferences with the Interstate Commerce Commission and the terms of the agreement (Ex. G), Knox entered a plea of nolo contendere in the criminal action brought against it by the Interstate Commerce Commission (T., pp. 111–112).

20. Because of alleged "pressures" for collection of undercharges which Carrier claims were being exerted by representatives of the Interstate Commerce Commission, Mr. Eisen arranged a meeting with representatives of the Interstate Commerce Commission in Washington on November 10, 1964, where Mr. Bowser and his counsel were informed that the Interstate Commerce Commission was not concerned with Carrier's pursuing a claim for the undercharges (T., pp. 119–122).

21. The only occasions that a representative of the Interstate Commerce Commission made any statements about collection of undercharges was in the latter part of 1963, which was prior to the time of the filing of the criminal actions, prior to the time of the amendment to the Schedule of Charges (Ex. D), and prior to the time of the agreement between the parties (Ex. G), and their meeting on November 10, 1964 with the representatives of the Commission in Washington, D. C. Carrier seems to justify bringing this civil action because of alleged threats of criminal penalties made in 1963 by employees of the Interstate Commerce Commission Motor Vehicle Bureau if Carrier did not institute suit to collect the additional transportation charges.

22. The criminal charges brought against Carrier in March, 1964, referred to in Finding 17, were disposed of in 1964. The complaint in this action was filed on January 21, 1966, a time when there was no realistic threat of further criminal prosecution. We do not give any credence to Mr. Bowser's testimony indicating that pressures of the representatives of the Interstate Commerce Commission were responsible for bringing this civil action. (T., pp. 141, 143, 149–152.)

23. The freight charges involved in this action billed by Carrier and paid by Knox, including the charges for stopping in transit at the Pennsylvania Knox plants to complete loading were in accord with the contract between the parties.

24. In the publication of Carrier's MC 1218, MF I.C.C. No. 3 Schedule of Charges in effect at the time involved in this proceeding (Ex. C), Carrier inadvertently and mistakenly failed to include or see to the inclusion of a rule whereby shipments subject to truckload rates set out in the Schedule of Charges may be stopped at points of origin for partial loading, and the applicable rate on such shipments will be the truckload rate provided in the Schedule.[3] Cf. with the amendment to the Schedule, Exhibit D, Item 40(A), supplementing Exhibit C.

---

3. The parties agreed, inter alia: "[T]hat upon passage of interstate motor carrier regulation, the oral arrangements and agreements, as aforesaid, were sought to be reduced to writing, and, as most pertinent here, the rates and charges as well as the rules and regulations applicable in connection with them were to be published by B&C [Carrier] in a Schedule of Minimum Charges; that, in effecting such publication, B&C inadvertently omitted complete provisions relating to the stopping in transit to complete loading at the various Knox plants in Pennsylvania; that neither B&C nor Knox were aware of such omission and both, respectively, billed, received and paid freight charges based upon arrangements and agreements that always were intended and understood to be in effect; and, that both B&C and Knox agree that the charges so paid and collected were based on rates, rules and provisions mutually desired, intended and agreed upon, and, accordingly, the charges so paid are considered by both to have been those actually contracted for." (Ex. G.)

25. In the agreement between the parties dated August 21, 1964 (Ex. G), Carrier agreed it would not make any claim for alleged undercharges against Knox.[4]

## DISCUSSION

It is clear that absent the Interstate Commerce Act, § 318(a), Title 49 U.S. C.A., this contract action would result in judgment for the defendant, Knox.

■ The evidence clearly shows that the written agreement (Ex. F) and the Schedule of Charges incorporated therein did not express what the parties intended, and that what the parties intended was omitted therefrom inadvertently and by mistake. By clear, precise and convincing evidence, it was proved that Carrier, which seeks to enforce the Schedule of Charges, a part of the written agreement, has admitted and acknowledged that it did not express in the Schedule of Charges what the parties intended, and that what the parties intended was omitted from the Schedule of Charges by inadvertence and mistake. See: Dunn v. Orloff, 420 Pa. 492, 218 A.2d 314 (1966); In re Boyd's Estate, 394 Pa. 225, 146 A.2d 816 (1958); Ward v. Zeigler, 285 Pa. 557, 132 A. 798 (1926).

■ Moreover, the contract carrier was required by law to file with the I.C.C. a rate schedule in conformity with the actual contract made with Knox. Since the filing of a correct tariff was its sole responsibility, Carrier's failure to do so was a breach of its contractual duty to Knox. To the extent that Knox was damaged thereby, it would be entitled to damages from Carrier, thus negating any undercharges to which Carrier might be entitled *if the strict rule applicable* to common carriers by rail should be applied.

■ Despite its admission and agreement not to make any claim for alleged undercharges, and its unvarying conduct over the years in billing Knox according to the actual contract between the parties, and despite the unconcern of the I.C.C., Carrier contends that it is entitled to recover from Knox the difference between the transportation charges actually paid and the charges computed on the basis of the filed, albeit erroneous, Schedule of Charges (Ex. C). It contends that under the law no act or omission on its part may estop it from collecting less than the filed charges. In short, it insists that the law of contracts and equity must give way to the statutory requirement as is the case if Carrier were a common carrier.[5] We do not agree.

Under the facts and circumstances of this case, we think the intentions of the parties expressed by the parol terms of their private contract, and the disclaimer of Carrier, should prevail.

■ Contract carriage is grounded on individual contracts between shippers

---

4. Paragraph "3" of Exhibit G provides: "B&C [Carrier] agrees that it will not, at any time, either now or in the future, make any claim or charge of any kind or nature that the inadvertently published Schedule of Minimum Charges, rather than the mutual agreements or arrangements, reflect the correct and proper rates and freight charges and, accordingly, B&C further agrees that it will not, at any time, either nor or in the future, make any claim for alleged undercharges with respect to the freight charges assessed by it against Knox, and so paid by Knox, for the transportation of its products and, more particularly, the stopping of shipments in transit at the Knox plants located in Pennsylvania to permit the completion of loads."

5. *Pittsburgh, etc., Ry. Co. v. Fink,* 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919); *Louis. & Nash. R. R. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L. Ed. 853 (1915); *Atchison, etc., Ry. Co. v. Robinson,* 233 U.S. 173, 34 S.Ct. 556, 58 L.Ed. 901 (1914); *Penna. R. R. Co. v. International Coal Min. Co.,* 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446 (1913). We think it is probable that the law settled as to common carriers in interstate commerce by rail would apply to common carriers by motor vehicle. (Section 317(b), 49 U.S.C.A.) But see, *National Van Lines v. United States,* 355 F.2d 326 (7th Cir. 1966), where contractual principles were applied in a common motor carrier case.

and contract carriers. It is not based on a continuing offer to provide service to the general public, as is common carriage. Common carriage is regulated to protect the public from price discrimination; contract carriage is regulated to protect common carriers from cut-throat competition by contract carriers (§ 318 (b), 49 U.S.C.A.). Subject to that limitation, contract carriage is special and individual; its purpose is to meet the needs of the particular shipper. Thus the shippers need not look at the rates filed by the contract carrier, whereas the shipper by common carrier is absolutely bound by the filed tariff of the common carrier.

Since the rates actually charged Knox by Carrier were competitively comparable to those charged by common carriers operating in the vicinity, it is obvious why the I.C.C. expressed no concern in any action to enforce collection of the alleged undercharges. No common carrier was injured competitively by Carrier's mistake. On the other hand, if the rates mistakenly filed by Carrier were enforced by this court, not only would effect be given to Carrier's mistake and omission, but it would also enable Carrier to collect exorbitant rates for past services far in excess of those charged by common carriers offering similar services during the same period.

It is our opinion that in this action between parties to contract carriage, as distinguished from common carriage, contract principles should be applied in determining their rights and liabilities and not the rates filed in the erroneous Schedule of Charges. Accordingly, judgment will be entered in favor of Knox.

## CONCLUSIONS OF LAW

1. This court has jurisdiction to hear and determine this action, which arises under an Act of Congress regulating commerce, i. e., the Interstate Commerce Act, 28 U.S.C. § 1337.

2. Carrier as a contract carrier was responsible under the Interstate Commerce Act for preparing and filing with the Interstate Commerce Commission a correct Schedule of Charges in accordance with its contract with the shipper, Knox.

3. The failure by Carrier to publish a correct Schedule of Charges does not subject the defendant Knox to liability for payment of additional charges in accordance with an erroneous Schedule where both the shipper and the carrier agree that the Schedule does not reflect the contract between the parties.

4. Although the Interstate Commerce Act provides that a contract carrier shall not charge less than the rates specified in its schedule of charges, this provision does not subject a shipper to liability to the contract carrier for payment of schedule charges which carrier admits are incorrect.

5. Decisions of the Interstate Commerce Commission and legislative history of the Interstate Commerce Act clearly demonstrate that the purpose of contract carrier regulation is to protect the common carrier.

6. So far as the purposes of economic regulation of contract carriage are concerned they were completely satisfied by the freight charges published by Carrier (although incomplete by reason of the mistaken or inadvertent omission of the stoppage in transit rule) in view of the rates filed by the common carriers, W. I. Womeldorf & Sons and Motorway Corporation.

7. In view of all of the facts in this case, to permit Carrier, a contract motor carrier, to recover additional hauling charges based upon its admittedly erroneously published Schedule of Charges would unduly and unconscionably enrich Carrier who is responsible for publishing such Schedule of Charges. Such a result would be contrary to the purposes and principles of those sections of the Interstate Commerce Act which regulate contract motor carriers.

8. Judgment should be entered in favor of the defendant Knox.