390 F.2d 193
 BOWSER AND CAMPBELL, a Partnership, and Lloyd H. Bowser and
Stella Campbell, doing business as Bowser and
Campbell, a Partnership, Appellants,
v.
KNOX GLASS, INC., a corporation.
 No. 16599.
 United States Court of Appeals Third Circuit.
 Argued Nov. 21, 1967.
Decided Feb. 5, 1968.
 
 Michael J. Pugliese, Pittsburgh, Pa., for appellants.
 Thomas W. Pomeroy, Jr., Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa. (Judd N Poffinberger, Jr., J. Richard Lauver, Pittsburgh, Pa., on the brief), for appellee.
 Before HASTIE, FREEDMAN, and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 FREEDMAN, Circuit Judge.
 
 
 1
 This appeal presents the question whether a contract carrier may collect from its shipper the difference between its schedule of rates filed with the Interstate Commerce Commission and the lower rates it actually charged under its arrangement with the shipper which were inadvertently omitted from the schedule. The district court held that the carrier was barred from recovery. 264 F.Supp. 522 (W.D.Pa.1967).
 
 
 2
 Plaintiff, a contract motor carrier regulated by the Interstate Commerce Act,[1] performed services for defendant pursuant to contract. The contract presently involved was executed on May 12, 1958, and provided that the carrier should be compensated in accordance with the minimum rates fixed in a designated schedule of charges, its supplements and reissues. The schedule of charges, filed with the Interstate Commerce Commission, was issued on April 28, 1958, effective May 1, 1958, and was in effect during the period here involved. In practice the charges actually made and collected were less than those required by the scheduled rates but were what the parties had agreed upon. A small fee was charged for stops in transit, instead of treating each stop as an independent shipment and applying to it the applicable minimum rate as the schedule required. The district court found that the carrier inadvertently and mistakenly failed to file a schedule which would accord with the actual practice.
 
 
 3
 An investigation by the Interstate Commerce Commission disclosed the departures from the schedule of charges, and in consequence the Commission instituted successful criminal proceedings against the carrier and the shipper for violation of the Interstate Commerce Act. As a result of the investigation the carrier amended its schedule of charges effective January 25, 1964, to reflect the existing practice of the parties. Shortly after the criminal proceedings were instituted the present parties on August 21, 1964, entered into an agreement in which the carrier acknowledged that the charges it had collected were what it had in fact agreed upon with the shipper and therefore promised that it would make no claim for undercharges.
 
 
 4
 The carrier later brought the present action to recover from the shipper $26,978.32, constituting the undercharges for the period from January 24, 1960, which was free from the bar of the Pennsylvania statute of limitations.[2] After a nonjury trial the district court entered judgment in favor of defendant on the ground that it would be unconscionable to permit the carrier to recover. The court also reasoned that the amount of the undercharges would be cancelled out by the shipper's right to an equal amount as damages for the carrier's failure to file the proper rate, although no counterclaim for this had been pleaded by the shipper.
 
 
 5
 If plaintiff were a common carrier it clearly would be entitled to recover the undercharges regardless of the reason for the charge to the shipper of less than the rate filed with the Commission.[3] More than fifty years ago Mr. Justice Hughes in announcing the right of a common carrier to recover the undercharge from an innocent customer said: 'Deviation from (the filed rate) * * * is not permitted upon any pretext. Shippers * * * are charged with notice of it, and they as well as the carrier must abide by it * * *. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress * * *.' Louisville & Nashville Railroad Co. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Similarly, Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, 250 U.S. 577, 40 S.Ct. 27, 63 L.Ed. 1151 (1919). This policy prevents the application of the doctrine of estoppel.[4]
 
 
 6
 The problem is whether the same result is required in the case of a contract carrier. The regulation of contract carriers is a relatively new development arising out of the use of motor vehicles. Motor carriers became subject to federal regulation by the Motor Carrier Act of 1935 amending the Interstate Commerce Act.[5] The statute requires contract carriers to file their rates with the Interstate Commerce Commission and in language substantially the same as that relating to common carriers proscribes the charging of a rate different from the filed rate.[6] The shipper urges upon us, however, that a distinction exists because the Interstate Commerce Act contains a specific provision condemning discrimination among shippers by a common carrier[7] but makes no similar provision in relation to a contract motor carrier.[8] It points to the Supreme Court's recognition that the policy against discrimination by a common carrier among shippers is inherent in the purpose of the statute.[9]
 
 
 7
 It is true that the regulation of contract carriers is not designed to prevent discrimination among shippers, as it is in the case of common carriers. The purpose in regulating contract carriers is to prevent destructive competition between contract carriers and common carriers and among the contract carriers themselves.[10] The statute therefore originally authorized the Commission to regulate only the minimum rates filed by contract carriers.[11] In 1957 the statute was amended to require contract carriers to file their actual charges as well as their minimum rates.[12] As a result, there was thus conferred on common carriers a right of knowledge and surveillance of the actual competition from contract carriers.[13]
 
 
 8
 The fact that the policies underlying the regulation of common carriers do not coincide completely with those relating to contract carriers must be considered in relation to the basis for permitting a carrier's recovery of undercharges. A common carrier's recovery of the preferential discount fully repairs the discrimination among its shippers by the deviation from its published tariff, whereas a contract carrier's recovery of a discount deviation from the published rate will not retrospectively return the business which may have been taken from a competing common carrier or retrospectively restore a common carrier rate which may have been depressed by the contract carrier's unlawful discount.
 
 
 9
 This difference, however, reflects only a partial factor and is not enough to justify a disregard of the general policy that the rate filed must be observed, a policy which pervades the regulation of contract as well as common carriers and which is enforced by permitting any undercharges to be recovered in order to preserve the integrity of the filed rates. In the case of both the common and the contract carrier the refusal to validate the economic distortion by such doctrines as agreement, estoppel or unclean hands is a deterrent weapon in the enforcement of the statute and the public policy which underlies it. In the case of contract carriers it discourages pressure by powerful shippers for discounts, which create competition destructive to common carriers as well as to other contract carriers, by making it clear that the undercharges will accumulate and may always be recovered by the contract carrier within the period of the statute of limitations. For the same reason it also discourages the acceptance by shippers of discounts from contract carriers in the general course of competition.[14]
 
 
 10
 It is of no legal significance that the rate which the parties agreed upon among themselves would probably have been approved if it had been filed with the Commission. The forum for dealing with the schedule of charges is the Commission. Courts cannot in effect validate illegal rates long after the event, especially when in the interim the contract carrier's competitors-- other contract carriers and common carriers-- have relied upon the published charges.
 
 
 11
 The innocence of the shipper in relying upon the carrier to obtain approval of the rate they had agreed on is equally unavailing. The rate filed is a matter of public record of which the shipper must take notice at his peril. The hardship which is urged upon us is one which has already been dealt with in cases involving common carriers and has been found inadequate to alter the policy underlying the integrity of the schedule of charges.[15] Such instances of hardship may not be permitted to destroy the more far-reaching need to maintain respect for the rates established under the Commission's procedure and which other shippers and contract and common carriers alike must be able to rely upon as realistic facts rather than a screen which conceals illegal private practices.
 
 
 12
 Although the question has not often been presented under the federal statute, the view we take finds support in the few decisions which are reported.[16] In the several states where statutes regulate intrastate carriers and contain provisions quite similar to those of the Interstate Commerce Act, the unbroken trend of decisions is to the same effect.[17]
 
 
 13
 The applicable rule cannot be circumvented by the reasoning, which the district court accepted, that the failure to file the rate agreed on with the shipper amounted to a breach of contract for which the damages are to be measured at precisely the amount of the undercharges, thus eliminating the carrier's claim. In fact, the shipper filed no counterclaim for such damages. But regardless of this procedural element, to recognize a shipper's right to such damages would be to destroy the established principle by a change in form of the defense. Such a defense would not be available in an action by a common carrier,[18] and since we have determined that the same principle must be maintained as to preferential charges by a contract carrier, it follows that the defense must be equally unavailing in the present action.
 
 
 14
 The judgment of the district court in favor of the defendant and against the plaintiff will be reversed and the cause remanded for further proceedings consistent with this opinion.
 
 
 15
 VAN DUSEN, Circuit Judge (concurring).
 
 
 16
 The schedule of rates filed with the I.C.C. inadvertently omitted the provision, agreed to and followed by the parties, granting the shipper the privilege to stop a shipment to complete loading for an agreed charge of $6, later $10, for each additional stop. (Findings 8 and 9 on pp. 291A-292A and 24 on pp. 295A-296A) These charges were paid to the appellee carrier even though they were not specified in the filed tariff (Findings 16 at p. 293A). The tariff of at least two other common carriers in the area during the years in question (1960-1964) provided for the privilege of stopping in transit to complete loading with a charge of $10 for each stop. (Findings 12-15 on pp. 292A-293A).
 
 
 17
 No destructive competition could have resulted in this situation from charging the rates agreed to and followed by the parties since they were identical to the rates being charged by other common carriers. There seems no reason why 49 U.S.C. 318 should not be construed in accordance with the rule that a statute should be interpreted in each case in the light of the mischief Congress sought to remedy and the object it wishes to attain. See City of Newark v. United States, 254 F.2d 93, 97-98 (3rd Cir. 1958), and U.S. Supreme Court cases there cited, where this court said at p. 97:
 
 
 18
 'A situation not within the intention of the enacting body, though it is within the letter of the statute, is not within the statute.'
 
 
 19
 The cases cited in footnote 16 above involved deliberate attempts to evade the published tariffs.
 
 
 20
 In view of the unusual circumstances in this record, the appellee may well seek by petition for a writ of certiorari authorization from the Supreme Court of the United States to reach the fair and just result achieved by the opinion of the able district judge in spite of the sweeping language of the Supreme Court of the United States' decisions cited in the opinion of this court, which language I believe is binding on this court.
 
 
 
 [1]
 Interstate Commerce Act 201 et seq., 49 U.S.C. 301 et seq
 
 
 [2]
 Act of March 27, 1713, 1 Sm.L. 76, 1, as amended, 12 Purdon's Pa.Stat.Annot. 31
 
 
 [3]
 Section 217(b) of the Interstate Commerce Act applicable to common carriers by motor vehicle provides:
 '(b) No common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation or for any service in connection therewith between the points enumerated in such tariff than the rates, fares, and charges specified in the tariffs in effect at the time * * *.' 49 U.S.C. 317(b). See the substantially identical 6(7) applicable to railroads and other common carriers. 49 U.S.C. 6(7).
 
 
 [4]
 Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, supra at 582-583, 40 S.Ct. at 27
 
 
 [5]
 Interstate Commerce Act 201 et seq., 49 U.S.C. 301 et seq
 
 
 [6]
 Section 218(a) of the Interstate Commerce Act provides:
 'No such (contract) carrier shall demand, charge, or collect compensation for such transportation different from the charges filed in accordance with this paragraph * * *.' 49 U.S.C. 318(a).
 
 
 [7]
 Section 216(d) of the Interstate Commerce Act, applicable to motor carriers, provides:
 'It shall be unlawful for any common carrier by motor vehicle engaged in interstate or foreign commerce to make, give, or cause any undue or unreasonable preference or advantage to any particular person, * * * or description of traffic, in any respect whatsoever; or to subject any particular person, * * * or description of traffic to any unjust discrimination or any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this subsection shall not be construed to apply to discriminations, prejudice, or disadvantage to the traffic of any other carrier of whatever description.' 49 U.S.C. 316(d). See the substantially identical 3, par. (1) applicable to railroads and other common carriers.
 
 
 [8]
 Indeed, 218(a) of the Interstate Commerce Act provides:
 'Nothing herein provided shall be so construed as to require * * * (contract) carriers to maintain the same rates, rules and regulations for the same services for all shippers served. * * *' 49 U.S.C. 318(a).
 
 
 [9]
 Louisville & Nashville Railroad Company v. Maxwell, supra; Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, supra
 
 
 [10]
 See H.Rep. No. 895, 85th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News 1406 (1957); Ex Parte No. MC-12, Contracts of Contract Carriers, 1 MCC 628, 629-31 (1937); Statement by Senator Wheeler, explaining Motor Carriers Act, 79 Cong.Rec. 5657 (1935); Regulation of the Transportation Agencies, S.Doc. No. 152, 73d Cong., 2d Sess. 33-34 (1934); S.Rep. No. 482, 74th Cong., 1st Sess. 2 (1935)
 
 
 [11]
 Section 218(b) of the Interstate Commerce Act provides:
 'Whenever, after hearing, upon complaint or upon its own initiative, the Commission finds that any minimum rate or charge of any contract carrier by motor vehicle, or any rule, regulation, or practice of any such carrier affecting such minimum rate or charge, or the value of the service thereunder, for the transportation of passengers or property or in connection therewith, contravenes the national transportation policy declared in this Act, or is in contravention of any provision of this chapter, the Commission may prescribe such just and reasonable minimum rate or charge, or such rule, regulation, or practice as in its judgment may be necessary or desirable in the public interest and to promote such policy and will not be in contravention of any provision of this chapter. Such minimum rate or charge, or such rule, regulation, or practice, so prescribed by the Commission, shall give no advantage or preference to any such carrier in competition with any common carrier by motor vehicle subject to this chapter. * * * ' 49 U.S.C. 318(b).
 
 
 [12]
 Act of August 13, 1957, P.L. 85-124, 71 Stat. 343, 49 U.S.C. 318(a)
 
 
 [13]
 H.Rep. No. 895, 85th Cong., 1st Sess., 2 U.S.Code Cong. & Admin.News 1406, 1407 (1957)
 
 
 [14]
 See Minton v. General Shale Products Corp., 52 Tenn.App. 60, 371 S.W.2d 808, 813 (1963); Johnston v. L. B. Hartz Stores, Inc., 202 Minn. 132, 277 N.W. 414, 416 (1938)
 
 
 [15]
 Louisville & Nashville Railroad Co. v. Maxwell, supra 237 U.S. at 97, 35 S.Ct. at 494; Pittsburgh, Cincinnati, Chicago & St. Louis Railway Co. v. Fink, supra, 250 U.S. at 582, 40 S.Ct. at 27
 
 
 [16]
 Minton v. General Shale Products Corp., supra. See Bottemueller v. Wilson & Co., 57 F.Supp. 766 (W.D.Mo.1944); A & F Trucking Corp. v. Liggett Drug Company, 253 F.Supp. 699 (S.D.N.Y.1966)
 
 
 [17]
 Johnston v. L. B. Hartz Stores, Inc., supra; Papetti v. Alicandro, 317 Mass. 382, 58 N.E.2d 155 (1944); Butler v. Bell Oil & Refining Co., 70 Cal.App.2d 728, 161 P.2d 559 (1945); Hawley v. Little Falls Mill & Mercantile Co., 220 Minn. 165, 19 N.W.2d 161 (1945). See Steele v. General Mills, Inc., 329 U.S. 433, 67 S.Ct. 439, 91 L.Ed. 402 (1947); W. S. Dicky Clay Mfg. Co. v. Corder, 310 F.2d 764 (5 Cir.), cert. dismissed, 373 U.S. 908, 83 S.Ct. 1294, 10 L.Ed.2d 197 (1963)
 
 
 [18]
 Illinois Central Railroad Co. v. Henderson Elevator Co., 226 U.S. 441, 33 S.Ct. 176, 57 L.Ed. 290 (1913); Pettibone v. Richardson, 126 F.2d 969 (7 Cir. 1942); T & M Transp. Co. v. S. W. Shattuck Chemical Co., 148 F.2d 777 (10 Cir. 1945); F. Burkhart Mfg. Co. v. Fort Worth & D.C. Ry. Co., 149 F.2d 909, 910 (8 Cir. 1945)