**NYAD MOTOR FREIGHT, INC.,**
**Plaintiff,**

v.

**W. T. GRANT COMPANY, Defendant.**

**No. 68 Civ. 1674.**

United States District Court,
S. D. New York.

Nov. 17, 1972.

---

Alvin Borden, New York City, for plaintiff by William Biederman, New York City, of counsel.

Rogers, Hoge & Hills, New York City, by Frank Gordon, New York City, of counsel. James N. Blair, Frank Ciafone, Jr., New York City, for defendant.

## OPINION

BAUMAN, District Judge.

Plaintiff NYAD MOTOR FREIGHT, INC. (NYAD) seeks recovery of the sum of $130,958.57 in alleged undercharges and rebates in the assessment of motor freight charges for services it rendered defendant W. T. GRANT COMPANY[1] (GRANT). GRANT does not deny that NYAD performed the services alleged, but claims that it did not perform them within the scope of the authority granted to it by the Interstate Commerce Commission (ICC).

GRANT contends that NYAD performed pursuant to an oral agreement unauthorized by the ICC and further, that GRANT paid NYAD the full amount due when it paid each NYAD bill as submitted. NYAD seeks the difference between this amount and that prescribed by the schedule of rates filed with the ICC, as well as certain amounts it credited to GRANT's account for equipment which was paid for by GRANT but not used.

### I.

NYAD is a New York corporation which performed motor freight services for GRANT as an exclusive contract carrier from 1960 to 1967 pursuant to permits issued by the ICC. The permit in question here authorized NYAD to transport GRANT's merchandise and equipment over irregular routes "[b]etween New York, N. Y. and Metuchen, N. J. on the one hand, and, on the other, points in New York, New Jersey, Connecticut, Rhode Island, Massachusetts and Pennsylvania." In addition, it contained a restriction limiting the scope of NYAD's operating authority to services "to be performed under a continuing contract, or contracts, with W. T. Grant Company."

In accordance with the permit NYAD and GRANT entered into various written contracts before 1966 providing for various services which NYAD filed with the ICC along with various minimum rate schedules. Its services consisted mainly of delivering merchandise from GRANT's Metuchen, New Jersey warehouse and GRANT's consolidation center at Pier 22, New York City, to GRANT stores within the area authorized by the ICC and returning merchandise from the stores to Metuchen or Pier 22. Prior to pick-up by NYAD at Metuchen or Pier 22, the merchandise was sorted and placed in hampers. The driver loaded the hampers onto his truck and proceeded to the GRANT stores on his route where he exchanged the loaded hampers for empty hampers and return merchandise.

The charge for service to and from the stores was determined by a zone system. Zone 1 included all the stores which could be serviced by a driver in one ten hour day from Metuchen or New York City. Typically, a Zone 1 trip included as many as nine stops.

In April, 1966 a change in GRANT's warehousing procedure caused a change in the services rendered by NYAD. The new services were never incorporated into a written agreement and a schedule of minimum charges relating to these new services was never filed.

The new services came about in the following manner. In April, 1966 the consolidation operation at Pier 22 was discontinued and a new consolidation center was opened at the former Raritan Arsenal in Edison Township, New Jersey, several miles away from Metuchen, New Jersey. A smaller consolidation center was also established in the Bronx, New York, which received merchandise from vendors in the New York City area for shipment to the consolidation center

---

1. 49 U.S.C. § 318 provides for the filing and publication of rate schedules for contract carriers. The alleged undercharges are based on rates filed by NYAD as contract carrier for GRANT.

at Raritan. Merchandise received from vendors in the Bronx was unloaded from a vendor's truck directly into a trailer which was hauled to Raritan when full.

These services were materially different from those rendered under the ICC permit. A NYAD driver hooked up an empty trailer at Raritan in the morning, drove to the Bronx consolidation center, unhooked the unloaded trailer and hooked onto a loaded trailer. The loaded trailer was then taken back to Raritan. The NYAD driver on a "Bronx-Raritan switching" run did not participate in loading and unloading the trailer as did the driver in a Zone 1 trip under the written agreement between NYAD and GRANT. The entire procedure known as "Bronx-Raritan switching" could be accomplished in less than five hours and, presumably, the oral agreement that the charge for two round trips on this "switching" service would be the same charge as for one Zone 1 trip was based on the fact that two round trip Bronx to Raritan switches could be completed in about the time necessary to complete one Zone 1 trip under the existing written agreement between NYAD and GRANT.

On June 16, 1966 NYAD and GRANT entered into a new written agreement for transportation services to be performed by NYAD for GRANT. This agreement did not describe or provide for the Bronx-Raritan switching service nor did an amendment signed December 19, 1966 changing the earlier rate schedules.

On August 6, 1966 a new schedule of minimum rates filed by NYAD with the ICC became effective (M.F. I.C.C. No. 5 and supplements #1 and #2), but it did not describe or provide for the Bronx-Raritan switching service. NYAD and GRANT's new agreement of January 2, 1967, which superseded the agreement of June 16, 1966, likewise did not refer to it.

NYAD regularly invoiced GRANT for the charges for all Bronx-Raritan switching services rendered at the rate which had been orally agreed upon and these invoices were routinely paid.

The January 2, 1967 written agreement required GRANT to pay equipment charges for forty-eight (48) tractor-trailer combinations per day five days per week (Monday–Friday) so long as they were available, regardless of their actual use. This resulted in GRANT occasionally paying for equipment it was unable to use because of bad weather or holidays. On other occasions, NYAD was unable to provide the full number of tractor-trailer combinations required by the agreement.

GRANT was billed on a basis of 240 trip days per week (48 tractor-trailer units times five days per week). To compensate for the fact that GRANT was paying for equipment it did not use, either because of its lack of need or NYAD's occasional inability to provide it, NYAD and GRANT agreed that for all trip days per week over 240, but not over 260, GRANT would pay only for the cost of the driver but not for the cost of the equipment. This agreement was contained in a letter dated March 30, 1967 from Daniel Parker, President of NYAD, to Arthur Boyd, Distribution Manager of GRANT.

On December 31, 1967 NYAD ceased to be GRANT's contract carrier. In March, 1968 it presented GRANT with a series of "balance due bills"—one for each invoice containing a charge for the Bronx-Raritan switching service. The theory behind each of these bills was that the schedule of minimum rates and charges effective August 6, 1966 (M.F. I.C.C. No. 5) required that each Bronx to Raritan shipment be treated as one Zone 1 trip and that therefore the proper charges for these switching services were exactly twice the amount already paid by GRANT. Between April, 1966 and December 29, 1967, NYAD performed 2,204 Bronx-Raritan round trips for GRANT but charged at the tariff rate for 1,102 Zone 1 round trips. The total amount so claimed by NYAD as

undercharges for the Bronx-Raritan switching service was $123,720.57.

At the same time, NYAD also claimed that GRANT owed it $7,238 for credit extended by NYAD to GRANT in 1967 for equipment that GRANT had paid for but was unable to use. GRANT refused to pay all these balance due bills and NYAD commenced this proceeding to recover the amount claimed.

## II.

■ The question of GRANT's liability for amounts claimed as undercharges by NYAD for services performed on the Bronx-Raritan switching run turns on whether those services were within the scope of NYAD's authority as granted by the ICC to act as GRANT's contract carrier. Mars Express, Inc. v. David Masnik, Inc., 401 F.2d 891 (2nd Cir. 1968). If the services performed were within the scope of the permit, NYAD can recover the difference between the amounts actually charged and the minimum tariff rates filed with the ICC. Bowser and Campbell v. Knox Glass, Inc., 390 F.2d 193 (3rd Cir.1968), cert. denied, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968). If, on the other hand, NYAD was not acting within the scope of its permit, then it is not entitled to application of the tariff rates to its unauthorized service. Mars Express, Inc. v. David Masnik, Inc., supra.

The permit granted NYAD authority to perform services on "irregular routes . . . between New York, N. Y. and Metuchen, N. J. on the one hand, and, on the other, points in New York, New Jersey, Connecticut, Rhode Island, Massachusetts, and Pennsylvania." It was restricted to "a transportation service to be performed under a continuing contract, or contracts with W. T. Grant Company."

The permit authorizing NYAD to operate as a contract carrier for GRANT was based on a written contract filed with the ICC, which specified routes originating in New York, N. Y. or Metuchen, N. J.

The authorized service included the delivery of merchandise from points of origin to as many as nine GRANT stores on a single run. At each stop the NYAD driver unloaded the merchandise destined for that particular store and loaded empty merchandise hampers onto his truck. The completion of the nine stop route usually took one full day.

The switching service on the other hand was a non-stop run between the Bronx, N. Y. and Raritan, N. J. The NYAD driver had nothing to do with loading or unloading merchandise at either point. All the driver did was to haul an empty trailer from Raritan to the Bronx. At the Bronx, the empty trailer was disconnected and a loaded trailer was hooked onto the cab. The driver then returned to Raritan where he dropped off the loaded trailer, hooked up an empty trailer and returned to the Bronx. Two such round trips were easily completed in one day.

■ NYAD's failure to reduce this agreement to writing and file it with the ICC is of considerable significance. Its authority to operate as a contract carrier was restricted to situations where (1) there was a written contract between the parties and (2) the contract was on file and available for public scrutiny. See 49 C.F.R. §§ 1053.1, 1053.2. The policies underlying these requirements are obvious. The ICC permit, the published schedule of minimum rates, and the written contracts provide basic information which allows the ICC to gauge the costs of specific contract services and maintain reasonable rates among competing carriers. Cf. Bowser and Campbell v. Knox Glass, Inc., 390 F.2d 193, 195, 196 (3rd Cir. 1968), cert. denied, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968). In addition, the filing of these documents provides a mechanism for regulating competition between contract carriers and common carriers and among contract carriers themselves.

In this regard, the case at bar is completely distinguishable from *Bowser,* su-

pra, upon which plaintiff places his total reliance. There the contract carrier had permit authority to perform certain services but it inadvertently failed to reduce its filed schedule of minimum rates to reflect a written agreement with its shipper. The result was that the charges made and collected were less than the scheduled rates but were what the parties had agreed upon. Later the contract carrier sued to collect the difference between the schedule of rates it had filed with the ICC and the lower rates it had actually charged under its arrangement with the shipper. The Court held that the carrier could recover the difference. The Court acknowledged that the result was harsh but felt constrained to follow the well settled rule that "[d]eviation from [the filed rate] . . . is not permitted upon any pretext." 390 F.2d at 194 and emphasized that the purpose of the strict rule against rate discrepancies was "to preserve the integrity of the filed rates." 390 F.2d at 196.

This case is fundamentally different from *Bowser* in two respects. First, NYAD was altogether without permit authority to perform the services it rendered to GRANT on the Bronx-Raritan switching run. NYAD's permit did not authorize shipments from the Bronx, N. Y. or Raritan, N. J. to points in New York or New Jersey. Second, even if the permit could be construed to authorize shipments from the Bronx, N. Y. or Raritan, N. J. it is clear that the type of service performed on the switching run was never contemplated by the schedule of rates NYAD filed with the ICC.

This case, therefore, closely parallels *Mars Express, Inc. v. David Masnik, Inc.*, 401 F.2d 891 (2nd Cir. 1968) where our Court of Appeals rejected the contention that the *Bowser* rule requires a shipper to pay a carrier at the tariff rate for services which were not within the scope of its operating authority or filed rates.

In *Mars*, plaintiff, a common carrier, was authorized to operate between cer-

tain New Jersey counties and parts of New York, including Peekskill, and between those same New Jersey counties and parts of Connecticut, including Bridgeport. The plaintiff was not authorized, however, to operate directly between Peekskill and Bridgeport. Plaintiff made the direct Peekskill-Bridgeport run carrying defendant's goods at a reduced rate. In rejecting plaintiff's claim for the difference between the rates it had filed with the ICC and the reduced rate it had actually charged, the Court said:

> "It is difficult to see how we respect the integrity of I.C.C. rate schedules or certificates by making it profitable for carriers to act beyond the scope of their operating authority." 401 F.2d at 894.

I believe that Court's reasoning to be applicable to the facts of the case at bar. I therefore find that NYAD has received everything it is entitled to from GRANT.

Accordingly, plaintiff's claim for alleged undercharges is denied.

### III

NYAD also claims that it is entitled to recover charges for certain alleged "free trips" it provided GRANT. This claim must also fail.

The agreement between NYAD and GRANT dated January 2, 1967 required that GRANT pay equipment costs for 48 tractor-trailer combinations for five days per week (Monday–Friday) regardless of whether they were actually used. The equipment often was not used because of weather conditions, holidays, or GRANT's lack of need for transportation. However, GRANT was billed for a minimum of 240 trip days per week (48 tractor-trailer units five days per week).

Subsequently, NYAD and GRANT agreed that for all trip days per week over 240, but not over 260, GRANT would pay only for the cost of the driver but not for the cost of the equipment. This agreement was set forth in a letter

dated March 30, 1967 from Daniel Parker, President of NYAD, to Arthur Boyd, Distribution Manager of GRANT. Its purpose was to credit GRANT, approximately, for equipment for which it had paid but had not been able to use. As such, it modified the January, 1967 agreement. It was in writing and corresponded to the actual experience of the parties. NYAD introduced no proof to show that the result was to provide a discount or rebate to GRANT.

Plaintiff's second claim is therefore denied.

Accordingly, judgment shall be entered for the defendant in all respects.

The above constitute my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.