**NYAD MOTOR FREIGHT, INC.,**
**Plaintiff-Appellant,**

v.

**W. T. GRANT COMPANY,**
**Defendant-Appellee.**

No. 37, Docket 73-1454.

United States Court of Appeals,
Second Circuit.

Argued Oct. 18, 1973.

Decided Oct. 31, 1973.

William Biederman, New York City (Alvin Borden, New York City, of counsel), for plaintiff-appellant.

Frank H. Gordon, New York City (James N. Blair and Rogers, Hoge & Hills, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, Chief Judge, and LUMBARD and TIMBERS, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

Nyad Motor Freight, Inc. served as a contract motor carrier for W. T. Grant Company from 1960 through 1967, under a permit issued by the Interstate Commerce Commission. In this action Nyad seeks recovery of $130,958.27 which it allegedly failed to charge Grant under its filed contracts and tariffs, and this failure, it claims, violated the Interstate Commerce Act. Nyad admits that the price reductions were agreed to by the parties, and does not contend that they were objectively unfair. Strict liability is sought to be imposed under the Act solely on the principle that the integrity of the regulatory scheme must be maintained, regardless of the equities of the parties *inter se.*

Appellant commenced this action in the Supreme Court of New York, New York County. The complaint set forth two causes of action, each arising under § 218 of the Act, 49 U.S.C. § 318(a). Grant removed the case to the United States District Court for the Southern District of New York. Following a bench trial before Judge Bauman, judgment was entered denying recovery on both claims in accordance with an opinion and order dated November 17, 1972, D.C., 350 F.Supp. 692. We affirm as to the first cause of action but reverse as to the second.

Before turning to the particulars of the present appeal it will be helpful to set forth the governing legal framework. The parties do not disagree on the applicable fundamental principles of law and there is virtually no factual dispute. The controversy is concerned solely with the application of the general rules to the specific circumstances at hand.

As a contract carrier Nyad could legally operate only within the authority granted by its permit. 49 U.S.C. § 309. Unlike a common carrier, however, Nyad was also limited by the scope of its contracts with Grant which, pursuant to ICC regulations, 49 CFR §§ 1053.1, 1053.2, 1053.6, must be in writing and filed with the Commission. In determining the authority of Nyad to perform particular services, therefore, we must look to both the ICC permit and the written contracts on file.

The core provision of the statutory scheme is § 318(a), which requires a contract motor carrier to file schedules setting forth the actual rates, or in some circumstances the minimum rates, it charges for services.[1] It is illegal for the carrier to demand or collect less from the shipper than the filed rates.

It has been clear at least since Justice Hughes's opinion in Louisville & Nashville R. R. v. Maxwell, 237 U.S. 94, 35 S. Ct. 494, 59 L.Ed. 853 (1915), that a common carrier may, despite its own complicity, recover any illegal differential between its filed rates and the actual charges made. The Court acknowledged the potential harshness of imposing this rule of strict liability, but believed it was necessary to preserve the integrity of the tariff system. The shipper, or, as in *Maxwell*, the passenger, is charged with constructive knowledge of the carrier's schedule, and bears a duty equivalent to that of the carrier to abide by it.

This rule has recently been extended to contract motor carriers. Bowser & Campbell v. Knox Glass, Inc., 390 F.2d 193 (3d Cir.), cert. denied, 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365 (1968). In *Bowser*, unlike the instant case, it was clear that the services were authorized under both the permit and contract.

Without the knowledge of either party, a trade association authorized by the carrier to revise its rates filed a new tariff, increasing the charge for the services in question. The parties continued their transactions for a time under the obsolete schedule until the trucker, having learned of the new rates, brought suit to recover the amounts it had inadvertently failed to collect. The Court of Appeals reversed a judgment of the district court denying the recovery. Although Judge Freedman's reasoned opinion recognized that the regulation of contract carriers serves a somewhat different purpose from that governing common carriers, it determined that there existed an equal need to encourage strict adherence to rates filed for public consumption and accordingly upheld the right of action asserted.

The ICC, which is charged with enforcing compliance with the tariffs, 49 U.S.C. §§ 304, 312, 322, and which has power to disapprove or suspend proposed rates, 49 U.S.C. § 318(b), (c), must depend upon the filed contracts and schedules if it is to make a knowledgeable determination that the services being rendered and the charges being made are appropriate. Competitors of both the shipper and the carrier also have a right to rely on the filed documents for information throwing light on industry practices and charges. The right of recovery is based, therefore, on the need to ensure compliance with the regulatory scheme. Any price decrease must be submitted to the ICC for approval and public inspection and the shipper must accept the consequences if it is not.

This court dealt with a similar question in Mars Express, Inc. v. David Masnik, Inc., 401 F.2d 891 (2d Cir. 1968), a case concerned with a common motor

---

[1]. A contract carrier serving a single shipper may, after one year of operation, file minimum rather than actual rates. This privilege is intended to permit the parties to raise, but not lower, their agreed rates without filing each revision. In the present case Nyad took advantage of the statutory option by filing minimum rate schedules. From time to time it raised its prices under the contracts without filing new schedules. As we indicate *infra*, note 2, this has given rise to a subsidiary dispute between the parties over the amount Nyad would be permitted to recover if the judgment for Grant on the first cause of action were reversed.

carrier. We approved the principles set forth in *Bowser,* but held them inapplicable to the particular circumstances before us. Although the trucker had performed the carriage at a rate below its tariff, the particular services were not authorized by its ICC certificate of public convenience, which limited the territorial scope of the carrier's operations. The reduced rate service had involved routes clearly not granted by the certificate. Since the carriage was itself extra-territorial and thereby illegal, the tariff could not be said to provide an applicable rate. Allowing recovery of the undercharge, we reasoned, would reward violation of the statute and regulations and not encourage compliance.

Our task is made easier by the fact that both parties on this appeal accept the principles which emerge from *Bowser* and *Mars.* But Nyad asserts that the services involved in the two causes of action were authorized and that it charged less for them than was provided under applicable schedules. It therefore claims the district court erred in distinguishing *Bowser* and denying recovery. Grant, on the other hand, argues that the services were not authorized by either the permit or the contracts, and that an applicable tariff did not exist. It therefore relies on *Mars* in urging affirmance of the judgment in its favor. We turn now to the particular facts of this litigation.

### I.

The permit issued to Nyad by the ICC on December 29, 1960, limited its authority to carry goods in interstate commerce to the following:

> Such commodities, merchandise, supplies and equipment as are handled, used, sold or dealt in by chain or department stores,
> Between New York, N. Y., and Metuchen, N. J. on the one hand, and, on the other, points in New York, New Jersey, Connecticut, Rhode Island, Massachusetts and Pennsylvania.

> Restriction: The operations authorized herein are limited to a transportation service to be performed under a continuing contract, or contracts, with W. T. Grant Company.

Nyad's first claim concerns services performed between April 1966 and December 1967. Two filed contracts are relevant, one dated January 21, 1964, and another, superseding the 1964 agreement, dated June 16, 1966. Similarly, the services were governed by two successive tariffs, effective March 30, 1964 ("Schedule No. 4") and August 6, 1966 ("Schedule No. 5"), respectively. The first cause of action alleged that pursuant to an oral agreement, Nyad charged Grant $123,720.57 less for certain services than these schedules required.

The past transactions of the parties furnish a necessary backdrop to this dispute. Prior to 1966, Grant maintained so-called consolidation centers at Pier 22 in Manhattan and at Metuchen, New Jersey. Nyad's service consisted of picking up merchandise at one of these two depots and delivering it to several Grant stores located in the states listed in the permit. On the return trip the truck, on occasions, delivered goods from one or more of the stores to the consolidation center. In April 1966 Grant moved its main center from Pier 22 to Raritan, New Jersey, several miles from Metuchen. To maintain appropriate coverage of New York City suppliers the company opened a much smaller depot in the Bronx. In other respects, however, the basic service of transporting goods between the new Raritan center and the stores remained the same. The 1966 contract and schedule contained, *inter alia,* revisions to reflect the relocation of the centers.

Apart from these minor, and for our purposes irrelevant, changes in the basic service, the establishment of depots in the Bronx and Raritan bred a wholly new subsidiary activity that was never explicitly embodied in any written contract and for which a specific rate was never filed. The Bronx location, unlike

that of Pier 22 and Metuchen, was not intended to serve as a true consolidation center at which merchandise delivered by wholesalers could be packed into individual containers for shipment to specific stores. Instead, it acted as a mere collection point for goods Grant purchased and shipped in bulk to Raritan for consolidation and further shipment from there. To accomplish this purpose, it was necessary to initiate a wholly new transportation service, known to the parties as "Bronx-Raritan switching." By oral agreement Nyad undertook to pick up bulk-loaded trailers in the Bronx for delivery to Raritan, and to return with empty trailers from Raritan for reloading in the Bronx. Nyad's first claim relates solely to this new shuttle activity.

The two written contracts, one of which was executed after the switching operation began, make no reference to it. The price provisions of these contracts and of the related schedules were based on a system of geographical zones. With minor exceptions not pertinent here, the entire state of New Jersey was placed in Zone 1. Both the contracts and tariffs provided a price for each "Zone 1 round trip," defined as a round trip between "New York, New York and Metuchen, New Jersey, on the one hand" and points in Zone 1 on the other.

In their oral agreement the parties permitted the price for the new service to be determined by reference to the existing tariff, and did not file a specific contract and schedule governing it. Under the basic service to which we have referred, Nyad's trucks made stops at as many as nine Grant stores in the course of a single Zone 1 round trip. At each store the driver was required to assist in the loading and unloading. A normal Zone 1 round trip consumed about ten hours. By contrast, a switching round trip did not involve any stops, and took only five hours. For these reasons the parties decided between themselves that the price for *two* Bronx-Raritan round trips would be the same as that provided in the schedule for *one* Zone 1 round trip.

Nyad, recognizing the barrier to its claim if it seeks recovery on a non-filed contract or schedule, argues that since the Bronx is within "New York, New York" and Raritan is within Zone 1, the service between the two depots must be viewed as a "Zone 1 round trip," as defined in the filed documents to which we have made reference. We are urged to conclude from all this that Grant illegally paid for only half the number of round trips that Nyad performed. Nyad asserts that between April 1966 and December 1967 it performed the shuttle service 2,204 times but received compensation for only half as many "Zone 1 round trips." The amount sought to be recovered under the first cause of action was accordingly computed by multiplying 1,102 by the Zone 1 round trip rate.[2]

In denying recovery the district court concluded that the service was beyond the territorial scope of the permit; that it was not authorized by the contracts; and that, in any event, there was no applicable rate that could have been violated. On appeal Nyad concentrates its attack upon the first of these determinations.[3] Appellant argues that the Bronx-

2. Schedule No. 4 lists the Zone 1 round trip rate as $97. Prior to April 1966, however, the parties had privately raised this figure to $102, which is also the amount listed in superseding Schedule No. 5. Nyad contends that computation of the alleged undercharge for services during the period governed by Schedule No. 4 should be based upon the actual rate of $102. Grant, while denying liability, asserts that any recovery for services during this period should reflect only the filed rate of $97. Since we affirm the judgment denying any right of Nyad to further compensation, we need not decide this subsidiary dispute.

3. Appellant's preoccupation with the territorial scope of its permit may be explained, perhaps, by its desire to distinguish Mars Express, Inc. v. David Masnick, Inc., *supra*. As we have indicated, that decision denied liability because the services occurred over routes not granted to the carrier by its certificate of public convenience. *Mars*, however, involved

Raritan route was within the literal terms of the permit, and therefore must be deemed to have been authorized by it. See T. I. McCormack Trucking Co. v. United States, 251 F.Supp. 526 (D.N.J. 1966). We need not decide this question, however, since we agree with Judge Bauman's reasoned conclusions concerning the contracts and schedules, which provide ample support for the judgment rendered.

■ Nyad asks us to impose a tortured construction upon the documents before us. By focusing solely upon the zone method of price determination contained in the contracts and schedules, appellant does no more than mechanically demonstrate that "Bronx-Raritan switching" may come within the literal definition of a Zone 1 round trip. Nyad would have us totally ignore, however, the other contractual provisions that set forth the nature of the services to which the pricing management applied. Both the 1964 and 1966 contracts described the transportation to be rendered as pickup service at the consolidation centers and delivery to Grant *stores* in the three zones. Nothing in the filed contracts either expressly or impliedly contemplated transportation service solely between the depots. Similarly, as we have indicated, both contracts stated that Nyad would make as many as nine stops during each Zone 1 round trip. This obviously referred to stops at Grant stores in the zone, and was in conformity with the actual practice of the parties under the basic service. But the switching service did not include any stops at stores. We agree with the district court that the Bronx-Raritan arrangement was not contemplated by the contracts.

■ We reach a similar conclusion with respect to the rate schedules. The schedules merely set forth the same zone pricing provisions contained in the contracts. Here too, Nyad contends that

literally read, the tariffs encompass the shuttle activity. The schedules, however, did not contain any description of the services to be performed. They cannot be viewed in a vacuum and are meaningless without reference to the underlying contracts. Since we have already indicated that the filed contracts did not encompass the services in question, it follows that the zone prices had no application to the switching services.

■■ The rationale for recognizing the contract carrier's right to recover illegal undercharges is to ensure that accurate and reliable documents are filed. It is the primary duty of the carrier to submit contracts and schedules that adequately describe the services it performs and the rates it charges. We have noted also that the Commission and other carriers and shippers must be able to determine the nature of the operations from the public record. It is insufficient, therefore, for Nyad to say that the switching service was not explicitly prohibited by the contract. The real issue is whether interested individuals who inspected Nyad's ICC file could have determined that Nyad was performing the switching service, and, if so, could have concluded that the ICC had approved the Zone 1 rate to govern that operation. We agree with the district court that viewed in this light neither the contracts nor the schedules encompassed Bronx-Raritan switching, and accordingly we affirm the judgment on the first cause of action.

■ The second claim concerns services performed between March and August 1967, and therefore comes within the ambit of a third filed contract dated January 2, 1967. Schedule No. 5 remained in effect throughout the period. This cause of action relates only to the basic service performed by Nyad, that of carriage of goods between the consolidation centers and Grant stores with-

a common carrier. By definition, therefore, we were not required to determine the carrier's authority under any contracts. Nyad, on the other hand, is a contract carrier. To

distinguish *Mars*, it must demonstrate that the services in question were within the scope of both its permit and the filed contracts.

in the three zones. Nyad asserts that by letter agreement the parties illegally reduced the amounts payable under the tariff to the extent of $7,238.00.

Under the contract Nyad undertook to keep available 48 tractor-trailer combinations per day, five days per week—240 in all—for use in Grant's operations. Grant, for its part, agreed to pay a fixed charge for the equipment regardless of whether it was actually used. For example, if only 200 trips were made in a given week, Grant would pay Nyad for these trips on the basis of the zone price system, and, in addition, would pay a flat rate for the 40 units not used. The rationale behind this arrangement was that Nyad incurred fixed costs for the equipment whether it was actually used or not. Schedule No. 5 expressly stated that Grant was required to pay for trucks consigned to its use under the contract, whether or not it needed them.

Grant apparently decided it was paying an exorbitant amount for trucks it did not use whether because of holidays, slow periods in its business or poor weather conditions. It therefore induced Nyad to modify the agreement, as set forth in a letter dated March 30, 1967. The parties there agreed that in the future, Grant would not be charged for the equipment portion of any trips in excess of 240 but not exceeding 260. As a result, the price Grant would have paid under the zone system for as many as 20 trips per week was reduced by the fixed charge established for trucks not used. Nyad alleged that by virtue of this unfiled revision of the contractual arrangement Grant was charged $7,238.00 less than it would otherwise have been required to pay.

Judge Bauman properly perceived the reason behind the modification of the contract which was that over a period of time the new arrangement would result in Grant paying only for equipment it actually utilized. The effect would be that Grant would not be charged in busy weeks for trucks it had paid for but had not used because of holidays, slow periods or bad weather. Finding that Nyad had not established that the approximation

was inaccurate or that Grant had in fact received anything free of charge, the district court concluded that there had not been an illegal rebate.

We are unable to agree with this analysis. As we have indicated, the issue is not one of fairness but simply—as with the first claim—whether there has been a private deviation from the public tariffs. Nyad was not required to prove that Grant received something for nothing, but merely that the service was authorized, that it was governed by an applicable rate and contract on file, and that Grant was charged less than the rate required. Accordingly, we reverse the judgment on the second cause of action.

Because of the manner in which he disposed of this claim, Judge Bauman did not make explicit findings concerning the crucial factual issues noted above. Although Grant does not appear to dispute that each of these questions must be resolved in Nyad's favor, we remand to the district court for specific findings. If, as appears likely, the district court concludes that an illegal undercharge occurred, it will, of course, be necessary for it to compute the sum that Nyad may recover.