MARS EXPRESS, INC., Appellant,

v.

DAVID MASNIK, INCORPORATED,
Appellee.

No. 3, Docket 32155.

United States Court of Appeals
Second Circuit.

Argued Sept. 4, 1968.

Decided Oct. 3, 1968.

Thomas W. Murrett, Hartford, Conn. (Glenn E. Knierim and Joseloff, Murrett & Knierim, Hartford, Conn., on the brief), for appellant.

Francis J. Ortman, Washington, D. C. (David L. Citronberg and Zwecker, Balter & Citronberg, Bridgeport, Conn., Raysor, Ortman, Barbour, Welch & Bell, Washington, D. C., on the brief), for appellee.

Before LUMBARD, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

This is an action brought by a trucking company to recover undercharges for the transportation of 290 truckloads of liquor from Peekskill, New York to Bridgeport, Connecticut, where the defendant operated a wholesale liquor business. Plaintiff's claim is based on section 217(b) of the Interstate Commerce Act, which provides in pertinent part:

No common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation * * between the points enumerated in such tariff than the rates, fares, and charges specified in the tariffs in effect at the time; and no such carrier shall

refund or remit in any manner or by any device, directly or indirectly * * any portion of the rates, fares, or charges so specified * * * 49 U.S.C. § 317(b).

The amount involved is stipulated to be $19,023.50, plus interest. This represents the difference between the freight charges actually paid by defendant and a higher figure calculated by reference to the published tariff.

The United States District Court for the District of Connecticut (Edward C. McLean, J., sitting by designation) gave judgment for the defendant shipper, and the plaintiff carrier appeals. We find no error and affirm the judgment.

The plaintiff, Mars Express, Inc. ("Mars"), was a common carrier operating under the jurisdiction of the Interstate Commerce Commission. By the terms of its certificate of public convenience and necessity, Mars was authorized to operate (1) between certain New Jersey counties and parts of New York, including Peekskill, and (2) between those same New Jersey counties and parts of Connecticut, including Bridgeport. Mars was not authorized, however, to operate directly between Peekskill and Bridgeport.

From 1956 through December 1963, Mars billed defendant for shipping charges at a rate of 40 cents per hundredweight on loads of 36,000 pounds or over. This was pursuant to a rate application approved by the ICC in 1956. In that application, Mars represented that it would transport the liquor from Peekskill to Bridgeport by way of New Jersey. It also represented that it would transport the liquor in conjunction with another common carrier, Apex Express, Inc. ("Apex"). More specifically, Apex was to transport the liquor from Peekskill to New Jersey, and Mars would then transport it from New Jersey to Bridgeport.

In 1962, the New England Motor Rate Bureau, Inc., an association authorized by power of attorney to make rate applications for Mars, filed a new liquor rate with the ICC. The application was made without Mars' knowledge, and raised the applicable rate to 56 cents per hundredweight for loads of 36,000 pounds or more. The new rate was deemed "accepted" by the ICC effective March 1, 1962, and was subsequently published. For some inexplicable reason, however, neither plaintiff nor defendant learned of the new rate until December 1963, when Mars demanded that defendant pay additional charges on shipments delivered after March 1, 1962.

If this was all that had happened, then plainly Mars would be entitled to recover undercharges under section 217(b) of the Act. As Mr. Justice Hughes said in Louisville & Nashville Railroad Company v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 59 L.Ed. 853 (1915):

> Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress * * *

In a recent decision the Third Circuit remarked: "The rate filed is a matter of public record of which the shipper must take notice at his peril." Bowser and Campbell v. Knox Glass, Inc., 390 F.2d 193, 196 (3d Cir. 1968), cert. denied 392 U.S. 907, 88 S.Ct. 2061, 20 L.Ed.2d 1365.

The district court found, however, that Mars exceeded the scope of its authority as a common carrier by transporting the liquor directly from Peekskill to Bridgeport without going by way of New Jersey as its certificate stipulated. The finding of the court below was that Apex did not participate "to any appreciable extent, if at all" in this arrangement. "The trucks carrying the liquor went directly from Peekskill to Bridgeport. They were trucks operated by Mars." Since Mars was operating beyond its authority as a common carrier, the lower court ruled that Mars could not bring a section 217 (b) action for undercharges, and gave judgment for the defendant.

Mars does not dispute the fact that it violated the terms of its operating certificate by taking the liquor directly from Peekskill to Bridgeport. Nonetheless, it insists that because it possessed a certificate of public convenience and necessity, it is a common carrier within the meaning of the Act, and therefore entitled to recover undercharges. We find no merit in its contentions.

■ While Mars was a common carrier within the Act (and, although in the meantime it has ceased operating as such, still entitled to sue under the Act for monies it earned while it was a common carrier), it cannot recover undercharges for illegal carriage off route. In particular, Mars directs our attention to the recent decision of the Third Circuit in Bowser and Campbell v. Knox Glass, Inc., supra, where it was held that the right to recover undercharges is available to contract carriers as well as common carriers. The Third Circuit opinion, says Mars, means that any discrepancy between actual and published freight rates is forbidden. In addition, Mars argues that because carriers which violate the terms of their operating certificates may be fined under section 222(a) of the Act [49 U.S.C. § 322(a)], these are the only sanctions for which a defaulting carrier may be liable, and thus the route followed is irrelevant in a section 217(b) action.

Appellant appears to be somewhat confused by the choice of words in the opinion below. In dismissing the action, Judge McLean wrote that "plaintiff was acting as a contract carrier" for purposes of the Peekskill-to-Bridgeport route. While the Act distinguishes between common and contract carriers for regulatory purposes, it seems perfectly clear that Mars does not fit within the statutory definition of "contract carrier." A contract carrier by motor vehicle is defined by section 203(a) (15) of the Act as:

* * * any person which engages in the transportation by motor vehicle of passengers or property in interstate or foreign commerce, for compensation * * *, under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the *exclusive* use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer. 49 U.S.C. § 303(a) (15). [Italics added.]

In contrast, a common carrier by motor vehicle is defined by section 203(a) (14) of the Act as:

* * * any person which holds itself out to the general public to engage in the transportation by motor vehicle in interstate or foreign commerce of passengers or property of any class or classes thereof for compensation, whether over regular or irregular routes * * * 49 U.S.C. § 303(a) (14)

■ Mars is not a "contract carrier" because it holds itself out as a common carrier. See I. C. C. v. AAA Con Drivers Exchange, Inc., 340 F.2d 820 (2d Cir. 1965), cert. denied 381 U.S. 911, 85 S.Ct. 1533, 14 L.Ed.2d 433 (1965), where Judge Friendly said:

The definition of "common carrier by motor vehicle" in § 203(a) (14) stresses not what a person does but what he holds himself out to do. Holding out is important not only because of the significance historically given to it but because, even if the performance does not match the promise, the latter may have the adverse effect on "existing carriers upon whom the bulk of shippers must depend for access to market" which underlines the requirements of a certificate or permit. [Citing United States v. Drum, 368 U.S. 370, 374–375, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962)]. 340 F.2d at 825.

Even if Mars were a contract carrier, it is hard to understand how it can base its claim to the undercharges on its published tariff, since the tariff approved by the ICC is applicable only to Mars' activity as a common carrier, and since it does not possess a permit authorizing it to operate as a contract carrier.

Since Mars is not a contract carrier, it would appear that its reliance on the Third Circuit opinion in *Bowser*, supra, is misplaced. That case involved a contract carrier following an authorized route. Unlike Mars, the plaintiff in *Bowser* had not violated any of the terms of its ICC permit, and thus the situation is fundamentally different from the situation we have here. In allowing recovery for undercharges in *Bowser*, the Third Circuit emphasized that the purpose of the strict rule against rate discrepancies was "to preserve the integrity of the filed rates." 390 F.2d at 196. It is difficult to see how we respect the integrity of ICC rate schedules or certificates by making it profitable for carriers to act beyond the scope of their operating authority.

Mars' reliance on the line of cases beginning with Louisville & Nashville Railroad Company v. Maxwell, supra, is equally misplaced, since none of these cases involve situations where the carrier either knowingly or indavertently violated any of the terms of its operating certificate. Indeed, in every case cited by appellant, it appears that the carrier seeking undercharges traveled over a route authorized by ICC certificate or permit.

██ The fatal flaw in Mars' argument is its insistence that mere possession of a certificate of public convenience and necessity automatically entitles a common carrier to the rate on file with the ICC. A common carrier may not operate "unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission *authorizing* such operations." Section 206(a) (1), 49 U.S.C. § 306(a) (1) [italics added]. Certificates prescribe the points of origin and destination which the trucker may serve, and also restrict him to specified routes. Section 208(a), 49 U.S.C. § 308(a). Plainly Mars' certificate does not authorize it to transport liquor *directly* from Peekskill to Bridgeport. Lacking the necessary authorization, Mars was not operating legally as a common carrier when it transported defendant's liquor, and thus cannot assert a claim for undercharges based on the published tariff.

██ A certificate of public convenience and necessity is not a certificate authorizing common carriers to roam wherever they choose. Indeed, when the Interstate Commerce Act was amended in 1935 to give the ICC jurisdiction over trucking activities, it was thought that destructive competition could be prevented, as well as the "public interest" promoted, by restricting routes and stabilizing rates. It seems basic to the policy underlying the Act that before a common carrier can take advantage of its published tariff rates, it must follow its authorized route. To allow common carriers to transport goods by whatever route they choose would be to invite the kind of chaos that the Act was intended to forestall. See McLean Trucking Co. v. United States, 321 U.S. 67, 86, 64 S.Ct. 370, 88 L.Ed. 544 (1944). Compare Shirks Motor Express v. Foster Transfer, 214 Md. 18, 133 A.2d 59 (1957).

The judgment for defendant is affirmed.