**LAND OCEAN LOGISTICS, INC., Plaintiff,**

**v.**

**AQUA GULF CORPORATION and Aqua Gulf Transport, Inc., Defendants.**

**No. 97–CV–582A.**

United States District Court, W.D. New York.

Sept. 22, 1999.

Sullivan & Oliverio, Michael E. Appelbaum, of counsel, Buffalo, NY, for Plaintiff.

Brautigam & Brautigam, Daryl P. Brautigam, of counsel, Fredonia, NY, for Defendants.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio pursuant to 28 U.S.C. § 636(b)(1), on July 23, 1997. On January 15, 1999, defendants' filed a motion for motion for summary judgment. On June 28, 1999, Magistrate Judge Foschio filed a Report and Recommendation, recommending that defendants' motion for summary judgment be granted in part and denied in part.

Plaintiff filed objections to the Report and Recommendation on July 9, 1999. The parties waived oral argument on the objections.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions of the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, defendants' motion for summary judgment is granted in part and denied in part. Counsel for the parties shall appear on September 30, 1999 at 9:00 a.m. for a meeting to set a trial date.

IT IS SO ORDERED.

## REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was referred to the undersigned by the Hon. Richard J. Arcara, on July 23, 1997 for all pretrial matters. It is presently before the court on Defendant's motion for summary judgment, filed January 15, 1999 (Docket Item No. 30).

### BACKGROUND AND FACTS[1]

Plaintiff, Land Ocean Logistics, Inc., ("Land Ocean") ("Plaintiff"), a New York corporation with its principal place of business in the Town of Amherst, New York, is a transportation broker in the business of arranging and scheduling the shipment of various products from New York to Puerto Rico through the use of commercial trucking and sea transportation companies.

1. The facts are taken from the motion papers and pleadings. As neither party has objected to the fact statement provided in the September 2, 1998 Decision and Order, 181 F.R.D. 229 (W.D.N.Y.1998), that statement is adopted here.

Defendants Aqua Gulf Corporation ("Aqua Gulf") and Aqua Gulf Transport, Inc. ("Transport") ("Defendants") are New Jersey corporations with their principal places of business in Florida.

Aqua Gulf is engaged in the business of providing commercial trucking and transportation facilities to public and private businesses. Transport provides forwarding services using vessels from ports of the United States to Puerto Rico and return. Declaration of John Bruno, President of Transport, filed April 10, 1998, (Docket Item No. 17), ¶ 4. According to Bruno, although Aqua Gulf and Transport have their corporate headquarters at the same location in Boca Raton, Florida, the two corporations maintain separate corporate, financial, and accounting records, as well as separate employees at separate facilities. Declaration of John Bruno, dated January 8, 1999 ("Bruno Declaration"), attached as exhibit to Defendants' Motion for Summary Judgment, filed January 15, 1999 (Docket Item No. 30) ("Defendants' Motion"), ¶ 7.

The Complaint, filed June 13, 1997, alleges a breach of an agreement executed in New York, on or about June 16, 1992 [2], whereby Land Ocean and Aqua Gulf agreed to share certain commissions, fees, and profits with respect to Land Ocean customers for transporting freight through Aqua Gulf's shipping arrangements with various steamship lines operating between New Jersey and Puerto Rico. Complaint, ¶ 9. As part of the agreement alleged by Land Ocean, Aqua Gulf agreed to compensate Land Ocean with a certain percentage of the commissions, fees, and net profits received by Aqua Gulf with respect to this business. Complaint, ¶ 10.

James Kelly [3], President of Land Ocean, described the nature of Land Ocean's business and the circumstances of the agreement reached between Land Ocean and Aqua Gulf. Affidavit of James Kelley ("Kelly Affidavit"), attachment to Plaintiff's Statement of Material Facts, filed February 5, 1999 (Docket Item No. 33). Specifically, in 1989 Kelly incorporated a company known as TransCaribbean Trailer Transport, Inc. ("TTT"), a licensed general commodity, common, and contract carrier. Kelly Affidavit, ¶ 7. TTT was a land transporter of goods purchased by wholesalers and retailers in Puerto Rico from companies in the Western New York and Northern Pennsylvania area. *Id.* Through direct solicitation, Kelly established a customer base in Puerto Rico for TTT's services. *Id.*, ¶ 8.

Kelly subsequently became interested in expanding TTT's operation to provide customers an intermodal shipping rate, which included the cost of land and ocean transportation, thus relieving the customer of the burden of arranging for separate ocean transportation. Kelly Affidavit, ¶ 9. Kelly also became interested in logistical services, which involved consolidating several container shipments to a single or smaller number of containers for transport, resulting in substantial savings in transportation costs for the customer. *Id.*, ¶ 10.

For the purpose of entering the consolidation business and expanding TTT's customer base, Kelly acquired Tropical Transport, an ailing consolidation company. Kelly Affidavit, ¶ 12. According to Kelly, Tropical Transport had obtained an "ocean rate" with the steamship lines for the shipment of the goods it consolidated. *Id.* ¶ 11. However, Tropical Transport had been unable to make a profit, as it was charging customers an amount equal to

2. Although the Agreement is dated April 30, 1992 on its face, the notation "6-16-92" appears below Kelly's signature on page of 4 the Agreement. Exhibit 2 to Defendants' Memorandum. As this is also the date asserted in the Complaint, ¶ 9, the court concludes that the Agreement, although initially signed by Browne on April 30, 1992, was fully executed on June 16, 1992.

3. Also known as James Kelley, James A. Kelly, and James Kiliszewski. Proposed Confidentiality Agreement, Exhibit C to Plaintiff's Reply to Defendants' Opposition, ¶ 2.

the ocean rate assessed by the steamship lines. *Id.* Kelly then incorporated Land Ocean Logistics, Inc., a logistics company providing consolidation and shipping services to customers of TTT and Tropical Transport, on April 28, 1992. *Id.* Following the acquisition of Tropical Transport and formation of Land Ocean, Kelly's operations included direct and intermodal shipping as well as consolidation. *Id.*

Kelly alleges that he was approached in April 1992 by Robert J. Browne, owner of Aqua Gulf. Kelly Affidavit, ¶ 13. At the time, Aqua Gulf was a competing shipper and consolidator for Puerto Rican customers. *Id.* Kelly, intrigued by the level of ocean rate profits earned by Aqua Gulf, agreed to enter into what he described as a "joint venture—partnership agreement" with Aqua Gulf, in which Aqua Gulf performed consolidation services for Land Ocean, and the two parties divided the profits earned from the shared ocean rate and consolidation services. *Id.*, ¶¶ 13–14. The parties signed an Understanding of Agreement ("the Agreement") formally establishing this arrangement on June 16, 1992. *Id.*, ¶ 15; *see* Exhibit 2 to Defendants' Motion. Plaintiff also submitted what Kelly describes as an amended version of the Agreement, bearing the notation "8–13–92" on its face. Kelly Affidavit, ¶¶ 15–19; Exhibit E to Plaintiff's Statement of Material Facts.

According to Kelly, under the terms of the amended Agreement, Land Ocean would retain its customers and act as a consolidator. Kelly Affidavit, ¶ 15. Importantly, the Agreement provided that Land Ocean would bill Aqua Gulf Transport, a company also owned by Browne that conducted consolidation and shipping services, for consolidation charges, and the profits derived from Land Ocean's operations would thereafter be equally divided between Aqua Gulf and Land Ocean. Kelly Affidavit, ¶ 19. The parties also agreed that Aqua Gulf and TTT would not compete for existing customers, and that Land

Ocean would rent office space from Aqua Gulf. *Id.*

According to Kelly, the parties began operating under the Agreement in June 1992. Kelly Affidavit, ¶ 16. Land Ocean subsequently moved its consolidation activities to Aqua Gulf's warehouse in Deptford, New Jersey. *Id.*, ¶ 16. Aqua Gulf then assumed the actual consolidation operations. Kelly Affidavit, ¶ 16.

Accounting and bookkeeping regarding the Agreement was initiated and managed by Aqua Gulf. Kelly Affidavit, ¶ 16. Aqua Gulf's employees prepared invoices for Land Ocean, stating amounts owed by Transport to Land Ocean for consolidation and ocean shipping services. *Id.* Transport then invoiced the shipping and/or consolidation customers of Land Ocean, TTT, and Aqua Gulf. *Id.* Payments collected by Transport from the customers were sent to Land Ocean, in an amount equal to half the profit for the consolidation, ocean shipping, or both. *Id.*

Land Ocean received regular checks, invoices, and reports from Transport regarding the Agreement for approximately eleven months. Kelly Affidavit, ¶ 19. At this point, Kelly alleges that the reports were received with less frequency, and the payments from Transport stopped altogether in late August 1993. *Id.*, ¶ 20. As a result, Kelly alleges "Aqua Gulf and Aqua Transport" "simply took [Land Ocean]'s customers and refused to comply with the [A]greement." *Id.*

Kelly threatened to bring legal proceedings against Defendants in Puerto Rico for payments not received. Kelly Affidavit, ¶ 20. Kelly met with Browne in September 1994 and requested Land Ocean's share of the net profits from September 1993 to September 1994. *Id.* At that time, Browne gave Kelly a bank check in the amount of $62,449.63, issued by Transport, to satisfy any outstanding debt owed by Aqua Gulf to Land Ocean. *Id.;* Exhibit H to Plaintiff's Statement of Material Facts.

Land Ocean contends that Aqua Gulf and Transport failed to make payments to Land Ocean under the Agreement for the periods September 1994 through September, 1996 in a total amount of $124,899.26. Complaint, ¶ 17, ¶ 21. After requesting payment by the mailing of invoices to Aqua Gulf and Transport, Land Ocean commenced the present action in New York Supreme Court on June 13, 1997. On July 18, 1997, Defendants removed the case to this court.

On January 15, 1999, Defendants moved for summary judgment, contending (1) Land Ocean did not obtain a transportation broker license pursuant to the Interstate Commerce Commission Act and the Interstate Commerce Commission Termination Act, and therefore was not entitled to collect compensation for services performed; (2) Land Ocean never provided services for Defendants from September 1994 to September 1996; and (3) Plaintiff submitted no evidence that Transport was the alter ego of Aqua Gulf or that Aqua Gulf was a 'sham' corporation. Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Defendants' Memorandum"), attached to Defendant's Motion.

In addition to a statement of material facts filed in response to Defendants' summary judgment motion, filed February 5, 1999 (Docket Item No. 33), Plaintiff filed a cross-motion ("Plaintiff's Cross–Motion") seeking to (1) vacate the court's April 28, 1998 Scheduling Order, and (2) obtain sanctions against Defendants pursuant to Fed.R.Civ.P. 37(b)(2)(D), for failure to comply with the court's September 2, 1998 Order directing Defendants to provide discovery materials responsive to Plaintiff's requests. Plaintiff's Cross–Motion, filed February 5, 1999 (Docket Item No. 32).[4]

Defendants submitted a memorandum in response to Plaintiff's Statement of Material Facts on February 19, 1999 (Docket

Item No. 34) ("Defendants' Reply Memorandum"). For the reasons set forth below, Defendants' motion for summary judgment should be GRANTED in part and DENIED in part.

## DISCUSSION

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir. 1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Eastway Construction Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985).

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). A party opposing a motion for

---

4. Plaintiff's Cross–Motion will be addressed in a Decision and Order filed concurrent with this Report and Recommendation.

summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth "specific facts" showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex, supra,* at 324, 106 S.Ct. 2548; *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988). "Mere conclusory allegations or denials" in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Lipton v. The Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995); *Allen v. Coughlin,* 64 F.3d 77, 80 (2d Cir. 1995); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

In the instant matter, as stated, Defendants moved for summary judgment on the following grounds (1) as a broker not properly licensed by the Interstate Commerce Commission, Land Ocean cannot recover under the Agreement for services performed in violation of the Interstate Commerce Act and the Interstate Commerce Commission Termination Act, Defendants' Memorandum at 9–12; (2) Land Ocean cannot recover commissions and fees for the time period September 1994 through September 1996, as the business relationship between Land Ocean, Aqua Gulf, and Transport terminated in September 1993, and, as a result, Land Ocean did

not provide any services to Defendants during the asserted time period, Defendants' Memorandum at 13; and (3) Transport may not be held liable under the Agreement, as Plaintiff cannot establish that Transport is the alter ego of Aqua Gulf, or that Aqua Gulf was a 'sham' corporation, Defendants' Memorandum at 13–14.

**1.** *Plaintiff's Failure to Obtain an ICC License*

As stated, Defendants moved for summary judgment on the ground that Land Ocean cannot recover for services performed under the Agreement, as Land Ocean did not receive a license to perform brokerage services, and any services provided were therefore in violation of §§ 311(a)[5] and 10921[6] of the Interstate Commerce Commission Act ("ICC Act"), 49 U.S.C. §§ 3119(a), 10921, and § 13901 of the Interstate Commerce Commission Termination Act ("ICC Termination Act"), 49 U.S.C. § 13901. Defendants' Memorandum at 9–12.[7]

Section 13901 of the ICC Termination Act requires that "[a] person may provide transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or be a broker for transportation subject to jurisdiction under subchapter I of that chapter, only if the person is regis-

---

**5.** Section 311(a) of the ICC Act provided that "[n]o person shall for compensation sell or offer for sale transportation subject to this part or shall make any contract . . . to provide . . . or arrange for such transportation . . . unless such person hold's a broker's license issued by the Commission to engage in such transactions . . ." 49 App. U.S.C. § 311(a) (1973 Supp.).

**6.** Section 10921 of the ICC Act required that motor carriers who engage in interstate transportation obtain a license from the Interstate Commerce Commission ("ICC"). 49 U.S.C. § 10921 (1978 Supp).

**7.** 49 U.S.C. § 10921 was amended by the ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 907. The effective date of the ICC Termination Act was January 1, 1996. A court must apply the law in effect at the time

it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary. *Bradley v. School Bd. of City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). As the change in law has no effect on the substantive rights of the parties in this case, it is appropriate to apply the present law. *See Landgraf v. USI Film Products,* 511 U.S. 244, 268–269, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (absent clear Congressional intention to contrary, retroactive application of legislation is disfavored only when statute has "retroactive effect"— changing rights of parties and upsetting settled expectations of state of law). In any event, the court will determine whether Plaintiff's failure to obtain an ICC licensing permit rendered the agreement between the parties void based on both the ICC Act and the ICC Termination Act.

tered under this chapter to provide the transportation or service." [8] 49 U.S.C. § 13901 (1998).

In the instant matter, on January 28, 1992, in response to Land Ocean's application for an ICC licensing permit, the Commission stated that, prior to the issuance of such a permit, Land Ocean was required to obtain a surety bond.[9] Exhibit 2 to Defendants' Motion. According to John F. Grimm, Director of the United States Department of Transportation Office of Information Analysis, no insurance was ever filed, and Land Ocean's application for broker authority was dismissed effective October 5, 1996. Certification of John L. Grimm, dated November 17, 1997, Exhibit 2 to Defendants' Motion.

Kelly argues that whether Land Ocean was properly licensed is irrelevant to the obligations imposed by the joint venture allegedly created by the Agreement. Kelly Affidavit, ¶ 21. Specifically, Kelly contends that Land Ocean, as a joint venturer with Aqua Gulf, was not providing brokerage services. *Id.* According to Kelly, Land Ocean "is not suing for fees and brokerage services, it is suing because Aqua Gulf and Aqua Gulf Transport violated the Agreement, took [Land Ocean]'s customers and have failed to pay Land Ocean its share of the profits from the joint venture or account for any of those profits." *Id.*, ¶ 22.

■ As a threshold matter, a genuine issue exists as to the nature of the Agreement between Land Ocean and Aqua Gulf. *See* Discussion, *infra* at 15–20. However,

assuming *arguendo*, that the Agreement included the provision of brokerage or other services requiring a licensing permit under the ICC Act or the ICC Termination Act, Plaintiff's failure to obtain an ICC permit does not render the Agreement unenforceable.

■ Where a congressional statute provides specific penalties for violations, a court should not affix the additional sanction of rendering a private contract void unless the legislative history evinces such an intent; it is inappropriate to add judicially to the remedies provided in the statute. *Concord Industries, Inc., v. K.T.I. Holdings, Inc.*, 711 F.Supp. 728, 729 (E.D.N.Y.1989) (citing *Kelly v. Kosuga*, 358 U.S. 516, 519, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); *Bruce's Juices Inc. v. American Can Co.*, 330 U.S. 743, 755, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947)).

Section 14901 of the ICC Termination Act ("the Act") provides the ICC with the authority to impose penalties for violation of the registration licensing requirements found in § 13901 of the Act.[10] Moreover, § 14707 of the Act provides that a "person injured" by an individual operating in violation of § 13901 may bring a civil action to enforce that section. 49 U.S.C. § 14707(a) (1998). Given the remedies available to Defendants pursuant to the express language of the ICC Termination Act, the court is unwilling to declare the Agreement between Land Ocean and Defendants void based solely on Land

---

**8.** Chapter 135, subchapter I states "[t]he Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier ... (1) between a place in ... (C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States." 49 U.S.C. § 13501 (1998).

**9.** In its broker regulations, the ICC stated that a license or permit will not be issued unless the applicant has filed an effective surety

bond. 49 C.F.R. § 1043.4 (1995 Ed.). *See also* 49 U.S.C. § 13904(d) ("the Secretary may impose on brokers for motor carriers of passengers such requirements for bonds or insurance or both as the Secretary determined are needed to protect passengers and carriers dealing with such brokers.")

**10.** *This section replaced the repealed § 10321 of the Interstate Commerce Commission Act,* which provided the ICC with the authority to impose penalties for violations of the ICC Act. 49 U.S.C. § 10321 (1998).

Ocean's failure to obtain an ICC permit.[11]

In *Concord Industries*, the court explicitly rejected the argument that a party's failure to obtain an ICC permit invalidated a private contract. The defendants, a group of shippers, argued that a contract entered into with a carrier in which the carrier agreed to transport fuels for the shippers was unenforceable due to the carrier's failure to obtain an ICC permit as an authorized carrier or broker. *Concord, supra,* at 729. The court relied upon the ICC's authority pursuant to § 10321 of the ICC Act to impose penalties for violations of that statute, and the lack of evidence of Congressional intent to void private contracts in addition to assessing penalties where a party fails to obtain an ICC permit, in determining that the contract between the parties was enforceable despite the carrier's failure to obtain an ICC permit. *Id.* at 730.

In the instant matter, given the remedies provided by the ICC Termination Act and the ICC Act, and the absence of legislative history requiring the imposition of the additional sanction of rendering a private contract void, Plaintiff's failure to obtain an ICC licensing permit does not, by itself, render any agreement between the parties void.

Defendants rely on a March 9, 1988 decision by the ICC addressing a petition for a declaratory order in *Inf., Ltd.*, No. MC–C–30041 ("*INF*"), arguing that Land Ocean cannot recover amounts due under the Agreement based on its failure to obtain an ICC licensing permit. Defendants' Memorandum at 12; Attachment B to De-fendants' Memorandum. *INF* involved the recovery of undercharges by a carrier not in possession of a valid ICC licensing permit, in accordance with tariff rates previously filed by the carrier with the ICC. Specifically, Defendants refer to a footnote in the decision stating that while the carrier, INF Limited, held common carrier authority pursuant to a licensing permit issued September 14, 1982, INF, Limited was not entitled to recover undercharges regarding services provided prior to the date of issuance of the permit, as, according to the Commission, "[i]t is well settled that carriers are not entitled to recover undercharges if 'the carriage is unauthorized or illegal." *INF, supra,* at 1–2 n. 1, *see* Attachment B to Defendants' Memorandum.

In the instant matter, Plaintiff is attempting to recover pursuant to an alleged private contractual relationship between Defendants and Land Ocean. Defendants have referenced no authority holding that the failure of one party to a private contract to obtain a validly issued ICC licensing permit voids the contract. Even given the deference afforded agency determinations interpreting statutory requirements, *see Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), an agency ruling addressing the applicability of a tariff rate filed with the ICC pursuant to 49 U.S.C. §§ 10761(a) and 10762(a)(1) is far removed from the question of whether a private contract is enforceable where one of the parties to the contract fails to obtain an ICC licensing permit as required by § 13901.[12]

---

**11.** Additionally, § 10921 of the ICC Act requires that motor carriers who engage in interstate transportation obtain a license from the Interstate Commerce Commission ("ICC"). 49 U.S.C. § 10921 (1978 Supp.). Section 10321 of the ICC Act provides the ICC with the authority to impose penalties for violation of the Act. 49 U.S.C. § 10321 (1998).

**12.** *See also Fry Trucking Co. v. Shenandoah Quarry, Inc.,* 628 F.2d 1360 (D.C.Cir.1980); *Mars Express, Inc. v. David Masnik, Inc.,* 401 F.2d 891 (2d Cir.1968). Both *Fry Trucking* and *Mars Express* addressed whether a carrier operating outside of the route authorized by the ICC may recover undercharges in connection with services provided outside of such route. The court in each case held that the carrier could not recover undercharges in connection with services provided outside of the ICC authorized route. *Fry Trucking, supra,* at 1363; *Mars Express, supra,* at 893. As stated, the instant matter does not involve a carrier attempting to recover undercharges

Moreover, aside from Land Ocean's failure to obtain an ICC permit, Defendants do not contend that there was anything intrinsically illegal about the Agreement between Land Ocean and the Defendants. *See Concord, supra,* at 729 (noting that there was "nothing intrinsically illegal" about contract, and the carrier's violation of the ICC Act was "only a technical one."). Defendants could conceivably have inserted into the Agreement a clause requiring that, in the event Plaintiff failed to retain a validly issued ICC licensing permit, the Agreement would be rendered void. Their failure to include this precondition to their obligations under the Agreement does not warrant a finding that the Agreement is void, given the remedies set forth in both the ICC Termination Act and ICC Act. Land Ocean's failure to obtain such a permit is, by itself, insufficient to require dismissal of Plaintiff's cause of action. Accordingly, Defendants' motion for summary judgment on this ground should be DENIED.

## 2. *The Nature of the Agreement Between Plaintiff and Defendants*

■ Defendants also argued that, in asserting that the Agreement created a joint venture, Kelly was attempting to amend the Complaint, which asserted a cause of action based on the commission and fees allegedly due Land Ocean in connection with the services provided by Land Ocean as Defendants' broker. Defendants' Reply Memorandum at 2–3. Defendants contend that no joint venture relationship existed between Land Ocean and Defendants, and Land Ocean's services as provided to Defendants were limited to the provision of brokerage services. *Id.* at 3.

However, in the Complaint Plaintiff clearly alleged the existence of an agreement between the parties whereby "the parties agreed to share certain commissions, fees, and profits." Complaint, ¶ 9. According to Plaintiff, Aqua Gulf agreed to compensate Land Ocean with "a certain

percentage of all commissions, fees, and/or net profits received by Aqua Gulf." *Id.,* ¶ 10. Based on the allegations in the Complaint, by describing the Agreement as a joint venture between the parties, Kelly Affidavit, ¶ 15, Kelly was not attempting to raise a claim not previously addressed in the Complaint.

Defendants further contend that the Understanding of Agreement submitted by Plaintiff as evidence of the "joint venture—partnership" arrangement between the parties, Exhibit E to Plaintiff's Statement of Material Facts, is not a binding agreement to engage in a joint venture. Defendants' Reply Memorandum at 3. Bruno, the President of Transport, maintained that while a contractual arrangement between Transport and Land Ocean existed, Transport used the services of Land Ocean as a property broker licensed by the ICC from May 1992 to September 1993. Bruno Affidavit, ¶ 2.

Defendants also submitted the Declaration of Robert J. Browne, in which Browne stated that on April 30, 1992 he purchased 49% of the stock of Land Ocean from Kelly, and that he and Kelly become partners in the company, splitting all profits equally. Declaration of Robert J. Browne ("Browne Declaration"), attached as exhibit to Defendants' Motion, ¶ 1.

Further, the Agreement contains a clause stating "[a]ll profits from Land Ocean will be divided . . . equally by Mr. Browne and Mr. Kelly." Exhibit E to Plaintiff's Statement of Material Facts. Based on this evidence, some type of relationship beyond the mere provision of brokerage services existed between the parties. Viewing the inferences to be drawn from the facts in the light most favorable to Plaintiff, *Matsushita, supra,* at 587, 106 S.Ct. 1348, the court finds that whether a binding agreement to engage in a joint venture or only a brokerage relationship existed is a question of fact to be addressed at trial.

obtained in violation of its Operation Certificate.

Defendants pointed to testimony by Kelly during a deposition on July 1, 1997 in arguing that Kelly's affidavit was insufficient to raise a genuine issue of material fact. Defendants' Reply Memorandum at 7–8. Specifically, Defendants alleged that Kelly's description of the relationship between the parties as a joint venture was inconsistent with prior deposition testimony in which he stated Aqua Gulf was a customer of Land Ocean. *Id.*

However, during the deposition Kelly stated that Aqua Gulf Corporation was a customer of Amigo Trucking Lines, Inc. a successor company to Land Ocean. Transcript of Deposition of James E. Kelly, attached as exhibit to Defendants' Reply to Plaintiff's Statement of Material Facts, at 46. The mere fact that Kelly described Aqua Gulf as a customer of a successor company to Land Ocean does not preclude the existence of a joint venture arrangement between Land Ocean and Defendants as Plaintiff alleges. Given the existence of genuine issues regarding the nature of the Agreement, Kelly's statements, during a deposition in an unrelated cause of action by Land Ocean against Jean Brown and Steven Peters, does not warrant summary judgment.

Defendants also request summary judgment on the ground that Land Ocean did not provide transportation brokerage services to Defendants from September 1994 to September 1996, the time period for which Land Ocean claims payment is now due. Defendants' Memorandum at 13.[13]

Browne avers that he and Kelly agreed to dissolve Land Ocean in May 1994, at which time Kelly agreed to file the Articles of Dissolution. *Id.*, ¶ 4. Browne and Kelly subsequently met in Boca Raton in September 1994 and, according to Browne, Kelly stated he would have the dissolution of Land Ocean concluded by the end of that year. *Id.*, ¶ 5. Browne further stated that, although still an officer and director of Land Ocean, he was unaware of any

business conducted by Land Ocean after September 1994. *Id.*, ¶ 7.

Defendants also submitted the Declarations of John Bruno and Jean Brown in arguing that Defendants did not engage in business with Land Ocean subsequent to September 1993. *See* Exhibit 2 to Defendants' Motion. According to Bruno, Land Ocean did not provide Transport with brokerage services between September 1994 and September 1996. Bruno Declaration, ¶ 4. Brown, a former employee of TTT who handled certain paperwork for Land Ocean until March 1996, stated that, although Browne and Kelly prepared a sales contract of stock in which the two became equal partners in Land Ocean, the operations of Land Ocean ceased in mid 1994, and no further business was conducted between Land Ocean and Defendants after that date. Declaration of Jean Brown ("Brown Declaration"), dated March 26, 1998, attached as exhibit to Defendants' Motion, ¶¶ 2, 4.

Additionally, Defendants submitted the Declaration of Rick A. Rude, Esq., stating that, according to the New York State Department of Labor ("Department of Labor"), Land Ocean had not issued payroll checks since March 1995, and was therefore "out of business as of 3/31/95." Declaration of Rick A. Rude, Esq., dated March 26, 1998, exhibit 2 to Defendants' Motion ("Rude Declaration"), ¶¶ 2–3. In a letter to the Department of Labor which preceded the communication, Kelly stated that Land Ocean "had not issued payroll since March 1995," and requested that Land Ocean's unemployment insurance account be closed as it "would not be issuing any more paychecks as a company." *See* Exhibit attached to Rude Declaration.

Kelly argues that the Agreement between Land Ocean and Defendants never terminated. Kelly Affidavit, ¶ 18, 29. Kelly also contends that he never agreed to dissolve Land Ocean, and Browne never

---

**13.** Defendants do not, however, dispute that they did business with Land Ocean between

June 1992 and September 1993. Defendants' Memorandum at 13.

commenced dissolution proceedings. *Id.*, ¶ 28–29. Rather, Kelly alleges that Land Ocean now maintains its corporate status in New York. *Id.*, ¶ 27.[14] According to Kelly, "[t]he reason LOL did not do any business after September 1994 is that Aqua Gulf and Aqua Gulf Transport took all of its customers" in violation of the Agreement. *Id.*

Plaintiff submitted two invoices to Transport dated November 26, 1996, each in the amount of $62,449.63, as evidence of the provision of services during the time period at issue. Exhibit B to Complaint. One such invoice contained the description "commission for LOL accounts served by Aqua Gulf for period of 9/95 thru 9/96," while the other contained the identical description for the period September 1994 through September 1995. *Id.*

Although Defendants argue that summary judgment is warranted, as Land Ocean was not in existence after 1994, Defendants have not submitted the Articles of Dissolution of Land Ocean or any other evidence of such dissolution. Further, the Agreement itself contains no expiration date or time limitation. Exhibits D, E to Plaintiff's Statement of Material Facts.

The mere fact that Land Ocean did not have employees or issue paychecks following March 1995 does not preclude a finding that the corporation was in existence after that date. Given the conflicting evidence on the record, and Kelly's sworn statement that Land Ocean remained in existence from September 1994 to September 1996, and the Agreement was therefore still binding, the court finds there are genuine issues of material fact (1) whether Land Ocean was in existence between September 1994 and September 1996; (2) whether

Land Ocean and Defendants were involved in a business relationship calling for sharing of profits during this time period; and (3) if a contractual relationship existed between the parties, the nature of that relationship. Given these genuine issues of material fact, summary judgment is not warranted, and Defendants' motion for summary judgment on this ground should be DENIED.

### 3. *Alter Ego Relationship Between Transport and Aqua Gulf*

Finally, Defendants moved for summary judgment on the ground that Plaintiff failed to establish that Transport is the alter ego of Aqua Gulf, or that Aqua Gulf was a 'sham' corporation, as necessary to pierce the corporate veil pursuant to New Jersey law. Defendants' Memorandum at 13–14; Defendants' Reply Memorandum at 9. According to Defendants, Plaintiff has not provided any evidence beyond the mere allegations in the Complaint, ¶¶ 6, 12, that Transport is the "alter ego" of the Aqua Gulf.

Plaintiff contends that Transport and Aqua Gulf are not separately operated corporations, Plaintiff's Statement of Material Facts, filed February 5, 1999 (Docket Item No. 33), ¶ 2, and, although not specifically so stated in the Agreement, the Agreement is binding upon Transport as well as Aqua Gulf. Kelly Affidavit, ¶ 32.

 It is well settled that federal district courts sitting in diversity apply the choice of law principles of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Under New York choice of law principles, the law of the state of incorporation determines whether

---

14. Although Plaintiff submitted the invoices from Land Ocean to various customers as evidence of the arrangement, such invoices are inconclusive as to the relationship between the parties between September 1994 and September 1996, as they contain dates extending from June 3, 1992 to July 27, 1993. Appendix A to Plaintiff's Statement of Materi-

al Facts. Further, the evidence of payments received by Land Ocean from Transport is similarly inconclusive on the issue, as the last payment received is dated September 6, 1994. *See* Appendix B to Plaintiff's Statement of Material Facts; Check No. 18130, Exhibit A to Complaint.

the corporate form will be·disregarded. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir.1995). Aqua Gulf and Transport were both incorporated in New Jersey. Certificates of Incorporation, attached as Exhibits to Bruno Declaration, Exhibit 2 to Defendants' Motion. Accordingly, New Jersey law applies.

■ Under New Jersey law, even in the case of a parent corporation and its wholly-owned subsidiary, limited liability normally will not be abrogated. *State v. Ventron Corp.*, 94 N.J. 473, 468 A.2d 150, 164 (1983); *Mueller v. Seaboard Commercial Corp.*, 5 N.J. 28, 73 A.2d 905 (N.J. 1950). Except in cases of fraud, injustice, or the like, courts will not pierce the corporate veil. *Ventron, supra*, at 164. The purpose of the doctrine is to prevent the use of an independent corporation to defeat the ends of justice, perpetrate fraud, accomplish a crime, or otherwise evade the law. *Id.* (citations omitted).

■ Courts may pierce the corporate veil by finding that a subsidiary was "a mere instrumentality of the parent corporation." *Ventron, supra*, at 164; *Mueller, supra*, at 905; *see generally* Note, *Liability of a Corporation for Acts of a Subsidiary or Affiliate*, 71 HARV.L.REV. 1122 (1958). Application of this principle depends on a finding that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent. *Ventron, supra*, at 164. In making such a determination, New Jersey courts apply the traditional common law factors, including the presence in both corporations of the same officers, directors, and shareholders, financial support of the subsidiary's operations by the parent, whether the property of the subsidiary is used by the parent corporation as its own, the failure of a subsidiary to observe the formal requirements attributable to its operation, and the involve-

ment of the parent's corporate officers in the day-to-day business of the subsidiary. *See Ventron, supra*, at 165; *Mueller, supra*, at 909; *State v. Ventron*, 182 N.J.Super. 210, 440 A.2d 455, 463 (1981) (citing 7 A.L.R.3d 1343, 1966 WL 15503 (1966)).

■ Even in the presence of corporate dominance, however, liability is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law. *Ventron, supra*, at 165; *Mueller, supra*, at 34–35, 73 A.2d 905.

■ As stated, a party opposing a motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but must set forth "specific facts" showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex, supra*, at 324, 106 S.Ct. 2548; *Franco, supra*, at 587. "Mere conclusory allegations or denials" are insufficient to create a genuine issue of material fact where none would otherwise exist. *Lipton, supra*, at 469.

■ In the instant matter, Plaintiff has failed to submit evidence raising a genuine issue whether (1) Transport so dominated the affairs of Aqua Gulf that Aqua Gulf became the "mere instrumentality" of Transport, *Mueller, supra*, at 905, and (2) even if such dominance occurred, Transport "abused he privilege of incorporation by using [Aqua Gulf] to·perpetrate a fraud or injustice, or otherwise to circumvent the law." [15] *Ventron, supra*, at 164. Other the conclusory assertions in the Complaint, ¶¶ 6, 12 and the Kelly Affidavit, ¶ 32, Plaintiff has submitted no evidence supporting a finding that Transport was the alter ego of Aqua Gulf.

It is undisputed that no reference is made to Transport in the Agreement be-

---

15. Nor has Plaintiff submitted evidence raising a genuine issue of fact whether, based on the conduct of Transport, Aqua Gulf may be held liable to Plaintiff as the alter ego of Transport. As Aqua Gulf was a party to the Agreement, such a determination as to Aqua Gulf is unnecessary.

tween the parties or the addendum to the Agreement. Exhibit 2 to Defendants' Motion. Additionally, although Robert Browne is the CEO of Transport, Plaintiff has not asserted that Browne executed the agreement between Land Ocean and Aqua Gulf while acting as an agent of Transport, and based on a careful reading of the Agreement and its addendum, such an inference in unwarranted.

According to Bruno, Transport and Aqua Gulf are separate corporations engaged in distinct activities, as Aqua Gulf is a motor carrier while Transport provides forwarding type services. Bruno Declaration, ¶¶ 5–6. Significantly, Aqua Gulf was incorporated on June 7, 1978, and Transport was incorporated on May 31, 1984. Certificates of Incorporation, attached as exhibits to Bruno Declaration, Exhibit 2 to Defendants' Motion. Aqua Gulf's incorporation nearly six years prior to Transport negates any inference that Aqua Gulf was a sham corporation created by Transport to circumvent the law.

Although the two corporations have their corporate headquarters at the same location in Boca Raton, Florida, Bruno alleged that Transport and Aqua Gulf maintain separate books and corporate records, financial records, and accounts as well as separate employees and facilities. *Id.*, ¶ 7. Bruno stated "any representation that [Transport] is interchangeable with or the alter ego of Aqua Gulf corporation is not correct." *Id.*, ¶ 8. Significantly, Plaintiff has not submitted evidence to negate Bruno's averments that the corporate formalities between Aqua Gulf and Transport have been preserved.

In September 1994 Transport advanced funds to Aqua Gulf "for the purpose of final resolution and closure" of business with Land Ocean. Bruno Declaration, ¶ 9. However, the provision of funds to assist another Aqua Gulf in satisfying debt obligations is not sufficient to hold Transport accountable to Land Ocean for the alleged debt owed by Aqua Gulf. *See Marascio v. Campanella*, 298 N.J.Super.

491, 689 A.2d 852, 858 (1997) (that stockholder may have lent money to corporate property owner to pay its debts to subcontractor does not provide a basis for piercing the corporate veil and holding stockholder liable). While a pattern of such inter-corporate payments may be probative, the single transaction relied upon by Plaintiff is not.

Additionally, pursuant to the Agreement with Land Ocean, Browne began forwarding customers of both Transport and Aqua Gulf to Land Ocean. Browne Declaration, ¶ 2. However, the mere fact that some of Transport's customers were forwarded to Land Ocean for consolidation services is an insufficient ground upon which to bind Transport to the Agreement. Such conduct is not determinative of the absence of the corporate form between Aqua Gulf and Transport, as it equally indicative of either a joint venture relationship or independent cooperative business relationship for the purpose of implementing Aqua Gulf's agreement with Land Ocean. Similarly, the fact that Transport and Aqua Gulf have their corporate headquarters at the same location in Florida, given the undisputed evidence that the two corporations maintain separate facilities, corporate and financial records, and accounts as well as separate employees, is insufficient to raise a factual issue. Absent evidence of shared accounting or other indicia of an alter ego relationship, the circumstances in the instant matter do not support a determination that Aqua Gulf was the "mere instrumentality" of Transport. *Mueller, supra,* at 905.

Moreover, assuming, *arguendo,* that these factors, *i.e.,* satisfaction of the parent's debts, provision of the subsidiary's customers, and sharing of the same corporate address raise a genuine issue whether Transport so dominated Aqua Gulf as to require piercing of the corporate veil, Plaintiff has failed to submit any evidence that Transport was incorporated to "perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron,*

*supra,* at 164; *Mueller, supra,* at 34–35, 73 A.2d 905.

Plaintiff has submitted evidence of invoices sent and payment received from Transport from September 1993 until September 1994. Appendix A to Plaintiff's Cross–Motion, Invoices Prepared by Aqua Gulf Transport for Land Ocean Logistics, Inc. Pursuant to the Agreement. Additionally, Plaintiff attached to the Complaint photocopies of invoices directed to Transport, dated November 22, 1996, for services allegedly performed from September 1994 to September 1996. Exhibit A to Plaintiff's Statement of Material Facts. However, this information does not support a finding that Transport operated as an arm of Aqua Gulf that it so dominated Aqua Gulf's affairs as to bind itself to the agreement with Land Ocean through Aqua Gulf; rather, such evidence is equally indicative of a joint venture relationship for the purpose of performing the Agreement in which Transport participated as directed by Browne, their common owner.

Based on the record in the instant matter, no material issue exists whether Transport was the alter-ego of Aqua Gulf. Accordingly, Defendants' motion for summary judgment in favor of Transport should be GRANTED.

### CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (Docket Item No. 30) should be GRANTED in part and DENIED in part.